# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### March 1998 Session

## DOLLY N. CHURCH v. MARIA PERALES, M.D., ET AL.

### Appeal from the Circuit Court for Davidson County
### No. 96-C-1097     Barbara N. Haynes, Judge

---

### No. M1997-00227-COA-R3-CV - Filed August 22, 2000

---

This appeal involves a dispute between an elderly patient and her physicians regarding their treatment of a severe post-operative infection caused by a bowel perforation that occurred during gynecological surgery. The patient filed suit in the Circuit Court for Davidson County against five physicians and a hospital alleging medical battery and malpractice. The trial court granted a summary judgment to the physicians and the hospital and dismissed the patient's case. On this appeal, the patient takes issue with the summary judgment granted to her gynecologist, a consulting general surgeon, and the gynecologist attending her following surgery in her gynecologist's absence. We have determined that the trial court properly dismissed the patient's medical battery and informed consent claims against her gynecologist. However, we have also determined that the three physicians have not demonstrated that they are entitled to a judgment as matter of law on the patient's medical malpractice claim based on the delay in diagnosing and treating the bowel perforation.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Vacated in Part; and Remanded

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which HENRY F. TODD, P.J., M.S., and BEN H. CANTRELL J., joined.

Barbara G. Medley, Lewisburg, Tennessee, for the appellant, Dolly N. Church.

Noel F. Stahl, Nashville, Tennessee, for the appellee, Maria Perales.

Dixie W. Cooper and Shirley A. Irwin, Nashville, Tennessee, for the appellee, Laura Dunbar.

Ed R. Davies and E. Reynolds Davies, Jr., Nashville, Tennessee, for the appellee, Stephen J. Ross.

## OPINION

Dolly N. Church, a Lewisburg resident in her mid-seventies, had experienced problems with urinary incontinence and vaginal prolapse for several years. She had a partial hysterectomy in 1990 to address the prolapse problem, but the procedure was not successful. In December 1993, she consulted Dr. Maria Perales, a Nashville gynecologist, about these conditions. Dr. Perales examined Ms. Church, and, in addition to a grade three vaginal prolapse, she discovered a large cystocele protruding out of Ms. Church's vaginal wall as well as a rectocele in the posterior vaginal wall. Dr. Perales advised Ms. Church that her treatment options included surgery or a more conservative, non-surgical management of her condition. Ms. Church opted for the non-surgical option. However, in November 1994, Ms. Church returned to Dr. Perales to request surgery.

Dr. Perales had been inclined initially to perform the procedures laparoscopically. However, during her pre-surgical consultation with Ms. Church and Ms. Church's daughter on March 2, 1995, she discovered extensive hypermobility of Ms. Church's urethra along with the other conditions she had already observed. In addition, Ms. Church disclosed for the first time that she did not wish to receive any blood or blood products during surgery because she was a Jehovah's Witness. In view of Ms. Church's religious beliefs and the danger of blood vessel compromise during laparoscopic surgery, Dr. Perales decided to perform a more traditional exploratory laparotomy. While explaining the proposed procedure to Ms. Church, Dr. Perales discussed the possible removal of Ms. Church's fallopian tubes and ovaries, as well as the potential risks and complications of the surgery, including infection and bleeding. Following this discussion, Ms. Church consented to the surgery.

Ms. Church was admitted to Southern Hills Medical Center in Nashville on March 8, 1995 for her surgery. However, the surgery was postponed because of an unexpected complication that could have interfered with her anesthesia. She was re-admitted to Southern Hills on March 22, 1995. Before the surgery, she executed a consent form acknowledging that the operation's risks had been disclosed to her and specifically authorizing Dr. Perales, and any surgeons she might associate, to perform the exploratory laparotomy, a bilateral salpingo oophorectomy (removal of her ovaries and fallopian tubes), a bladder suspension, and anterior and posterior vaginal repair. She also authorized Dr. Perales "to do whatever . . . she deems advisable" if she or the other physicians encountered "unforseen conditions . . . in the course of the operation calling . . . for procedures in addition to or different from [the ones specifically listed]."

Unforeseen complications did arise during Ms. Church's surgery. While performing the vaginal vault suspension, Dr. Perales discovered that a portion of Ms. Church's bowel was adhering to the vaginal wall. Correcting this condition required Dr. Perales to cut a small loop of the bowel away from the upper portion of the vaginal wall. Dr. Perales also discovered a suspicious mass that had involved the left ovary and accordingly removed Ms. Church's ovaries, uterine tubes, and related ligaments. After removing the left ovary, Dr. Perales noted hardening and hypertrophy in a portion of Ms. Church's sigmoid colon. Suspecting malignancy, Dr. Perales summoned Dr. Laura Dunbar, a general surgeon, to the operating room for a consultation. Dr. Dunbar performed a limited rigid sigmoidoscopy but was unable to examine the abnormal bowel section itself because Ms. Church had not been prepped for a bowel procedure. Following these procedures, Ms. Church's incision was closed, and she was transferred to the recovery room.

Ms. Church's post-operative recovery did not go well. She experienced preternatual abdominal pain and nausea; her urinary output decreased; and she developed a persistent fever. Dr. Perales performed ultrasound and blood tests to determine the cause of Ms. Church's difficulties. On March 24, 1995, Dr. Perales consulted with Dr. Dunbar, and the two physicians decided to give Ms. Church additional fluids and to continue to monitor her kidney function. Three days later, on March 27, 1995, after Ms. Church did not improve, Dr. Perales consulted Dr. Clara Womack, a nephrologist. Dr. Womack examined Ms. Church, ordered a CT scan to verify that she had both kidneys, and then recommended continuing the regimen of managing Ms. Church's fluid intake.

Ms. Church's condition continued to worsen, and she began to experience shortness of breath. On March 29, 1995, seven days after surgery, Dr. Perales brought in Dr. Mary McElaney who concluded that Ms. Church was "in mild distress" and was suffering from low oxygen in her blood. An X-ray was taken to rule out the possibility of a blood clot. Dr. Perales left Nashville on March 29, 1995, to attend a conference in Arizona, leaving her patients, including Ms. Church, in the care of Dr. Steven Ross, a gynecologist.

Ms. Church's condition continued to deteriorate, and on March 29, 1995, Dr. McElaney approved transferring her to the Southern Hills intensive care unit where she was promptly placed on life support. Dr. McElaney advised Ms. Church's family that her condition was serious. Dr. Ross examined Ms. Church in the intensive care unit and ordered additional tests, including a second CT scan on March 29, 1995 which confirmed the presence of free air in Ms. Church's abdomen. By March 30, 1995, with Ms. Church's blood pressure dropping and her abdomen palpably tight, Dr. McElaney began to suspect sepsis (blood poisoning). Dr. Dunbar suspected acute pancreatitis.

On March 31, 1995, Ms. Church was returned to surgery for a second exploratory laparotomy performed by Drs. Dunbar and Ross. The operation revealed that Ms. Church had a perforated bowel that had caused a severe infection in her abdominal cavity.[1] The physicians repaired the perforation and drained what Dr. Dunbar characterized as "a large amount" of pus from Ms. Church's abdomen. Following this procedure, Ms. Church was returned to intensive care where she remained in serious condition for weeks. She was connected to a ventilator and required pulmonary artery catheter monitoring, as well as total parenteral administration of food and water. Ms. Church was not removed from life support until May 26, 1995. Thereafter, on June 22, 1995, three months after her admission to Southern Hills, Ms. Church was transferred to a nursing home in Lewisburg.

On March 21, 1996, Ms. Church filed suit in the Circuit Court for Davidson County against Drs. Perales, Dunbar, Ross, McElaney, and Womack and HCA Health Services of Tennessee, Inc., d/b/a Southern Hills Medical Center,[2] alleging medical battery and medical malpractice. All

---

[1] Ms. Church's evidence suggests that her small intestine was perforated during the March 22, 1995 procedure when Dr. Perales separated it from the vaginal wall.

[2] Ms. Church also named "John Doe, M.D." as a defendant, alleging that he was "an unknown doctor or nurse who rendered certain medical care for and on behalf of Dolly N. Church at the time of the matters complained of herein in Davidson County." The complaint contains no other mention of this party.

defendants filed answers denying liability. In August 1996, the trial court granted summary judgment to HCA and Doctors Womack and McElaney. Subsequently Drs. Perales, Dunbar, and Ross moved for summary judgment. In May 1997, the trial court granted those defendants summary judgment. Completely out of court on her lawsuit at that point, Ms. Church appealed from the summary judgment granted to Drs. Perales, Ross, and Dunbar.[3]

## I.

Summary judgments enable courts to conclude cases that can and should be resolved on dispositive legal issues. *See Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Airport Props. Ltd. v. Gulf Coast Dev., Inc.*, 900 S.W.2d 695, 697 (Tenn. Ct. App. 1995). They are appropriate only when the facts material to the dispositive legal issues are undisputed. Accordingly, they should not be used to resolve factual disputes or to determine the factual inferences that should be drawn from the evidence when those inferences are in dispute. *See Bellamy v. Federal Express Corp.*, 749 S.W.2d 31, 33 (Tenn. 1988).

Medical malpractice cases may be adjudicated by summary judgment in proper circumstances. *See, e.g.*, *Donnelly v. Walter*, 959 S.W.2d 166, 168 (Tenn. Ct. App. 1997); *Estate of Henderson v. Mire*, 955 S.W.2d 56, 59-60 (Tenn. Ct. App. 1997). In order to be entitled to a summary judgment, the moving party must demonstrate that no genuine issues of material fact exist and that he or she is entitled to judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04; *Byrd v. Hall*, 847 S.W.2d at 210; *Planet Rock, Inc. v. Regis Ins. Co.*, 6 S.W.3d 484, 490 (Tenn. Ct. App. 1999). A summary judgment should be denied, however, when a genuine dispute exists with regard to any material fact, *see, e.g., Seavers v. Methodist Med. Ctr.*, 9 S.W.3d 86, 97 (Tenn. 1999) (reversing a summary judgment in a medical malpractice action because of the existence of a genuine issue of material fact), or when the controlling law does not clearly entitle the moving side to either escape or impose liability. *See Hogins v. Ross*, 988 S.W.2d 685, 689 (Tenn. Ct. App. 1998) (reversing a summary judgment where the law did not support the moving party).

Our task on appeal is to review the record to determine whether the requirements for granting summary judgment have been met. *See Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997); *Aghili v. Saadatnejadi*, 958 S.W.2d 784, 787 (Tenn. Ct. App. 1997). Summary judgments do not enjoy a presumption of correctness on appeal. *See Nelson v. Martin*, 958 S.W.2d 643, 646 (Tenn. 1997); *City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn. 1997). Accordingly, when we review a summary judgment, we view all the evidence in the light most favorable to the non-movant, and we resolve all factual inferences in the non-movant's favor. *See Luther v. Compton*, 5 S.W.3d 635, 639 (Tenn. 1999); *Muhlheim v. Knox County Bd. of Educ.*, 2 S.W.3d 927, 929 (Tenn. 1999). A summary judgment will be upheld only when the undisputed facts reasonably support one conclusion – that the moving party is entitled to a judgment as a matter of law. *See White v. Lawrence*, 975 S.W.2d 525, 529-30 (Tenn. 1998); *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995).

---

[3]Ms. Church is not appealing the summary judgment dismissing her claims against Drs. McElaney and Womack or Southern Hills.

The record before us does not reveal the basis for the trial court's decision to grant the summary judgment motions filed by Drs. Perales, Dunbar, and Ross. The order dismissing the claims against these physicians simply states that their motions "were well-taken and should be granted." This order, while technically consistent with Tenn. R. Civ. P. 52.01,[4] provides little practical assistance to the parties or the court on this appeal. In complicated cases involving multiple parties, multiple claims, and multiple defenses, a reviewing court may find itself at a loss to decipher the actual basis for the trial court's decision. When this occurs, we have little choice other than to "perform the equivalent of an archeological dig and endeavor to reconstruct the probable basis for the [trial] court's decision." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 8 (1st Cir. 1998). Accordingly, trial courts can assist appellate review in complicated cases by disclosing clearly and briefly the factual and legal basis for their decisions. *See Thomas v. N.A. Chase Manhattan Bank*, 994 F.2d 236, 241 n.6 (5th Cir. 1993); *United States v. Woods*, 885 F.2d 352, 353-54 (6th Cir. 1989); *Landau v. J.D. Barter Const. Co., Inc.*, 657 F.2d 158, 162 (7th Cir. 1981); *Van Bourg, Allen, Weinbert & Roger v. NLRB*, 656 F.2d 1356, 1357 (9th Cir. 1981).

Apart from the straightforward cases involving a single issue such as the application of the statute of limitations, medical malpractice cases customarily involve issues and questions that would be greatly illumined by the trial court's explanation of its decision. The evidentiary standards uniquely applicable to medical malpractice cases ordinarily give rise to subtle and complex evidentiary questions for which some elucidation of the exact reasons for ending a case summarily will almost always be helpful. In this case, we are left to soldier on without guidance from the trial court.

## II.
### THE CLAIMS AGAINST DR. PERALES

We turn first to the summary judgment dismissing Ms. Church's claims against Dr. Perales. Ms. Church's complaint alleges three causes of action against Dr. Perales. First, Ms. Church alleges that Dr. Perales committed medical battery by performing surgery that she had not authorized. Second, she alleges that Dr. Perales did not properly obtain her informed consent to all the procedures that were performed on March 22, 1995. Third, she alleges that Dr. Perales negligently managed her post-operative recovery by failing to diagnose and treat her bowel perforation in a timely manner. We have determined that the trial court properly granted the summary judgment with regard to Ms. Church's medical battery and informed consent claims. However, we have also determined that material factual disputes preclude the summary dismissal of Ms. Church's malpractice claim based on Dr. Perales's management of Ms. Church's post-operative care.

## A.
### THE MEDICAL BATTERY AND INFORMED CONSENT CLAIMS

---

[4]Tenn. R. Civ. P. 52.01 exempts summary judgment orders from the requirement that decisions be accompanied by findings of facts and conclusions of law.

Ms. Church's complaint alleges that Dr. Perales "fell below the acceptable standard of medical care in this . . . community" by "performing unnecessary abdominal exploration after being evaluated and admitted for only urinary incontinence and vaginal prolapse" and by "failing to obtain her informed consent to the procedure and treatment." We have determined that these allegations embody two related, yet separate, claims. The first claim is for medical battery; the second claim is for failing to obtain informed consent.[5] Dr. Perales has demonstrated that she is entitled to a judgment dismissing these claims as a matter of law.

## 1.
### A PATIENT'S BODILY INTEGRITY

All competent adults have a fundamental right to bodily integrity. *See Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S. Ct. 2258, 2267 (1997); *Hezeau v. Pendleton Methodist Mem. Hosp.*, 715 So. 2d 756, 760 (La. Ct. App. 1998); *Mahan v. Bethesda Hosp., Inc.*, 617 N.E.2d 714, 718 (Ohio Ct. App. 1992); *Shellenbarger v. Brigman*, 3 P.3d 211, 216 (Wash. Ct. App. 2000). This right is rooted in the Anglo-American tradition of personal autonomy and the right of self-determination. *See Thor v. Superior Court*, 855 P.2d 375, 380 (Cal. 1993); *In re Gardner*, 534 A.2d 947, 950 (Me. 1987); *Brophy v. New England Sinai Hosp., Inc.*, 497 N.E.2d 626, 633 (Mass. 1986). Included in this right is the right of competent adult patients to accept or reject medical treatment. *See Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 278-79, 110 S. Ct. 2841, 2851-52 (1990).

Based on their recognition of a patient's bodily integrity, the courts have recognized that patients may recover damages from physicians who perform non-emergency medical procedures without their consent. There are four premises underlying these claims. The first is that the decision to undergo a medical procedure rests with the patient who, if competent, retains the right to exercise control over his or her own body. The second is that a physician has no right to subject a competent patient to a medical procedure without the patient's consent. The third is that a patient will ordinarily be unable to make an intelligent decision whether to consent to a procedure without a clear and adequate explanation by the physician of the nature, benefits, and risks of the contemplated procedure and of the other treatment alternatives available to the patient. Following up on the third premise, the fourth is that physicians have a duty, before performing a procedure, to provide an adequate explanation and to obtain the patient's consent. *See Dingle v. Belin*, 749 A.2d 157, 165 (Md. 2000).

The Tennessee Supreme Court has recognized that, depending on the circumstances, two causes of action may arise when a physician performs a procedure without the patient's consent. The first cause of action is one for medical battery; the second is one for failing to obtain the patient's

---

[5] Even though Ms. Church's complaint alleges that Dr. Perales performed "unnecessary" procedures on March 22, 1995, the record contains no evidence that any of the procedures Dr. Perales performed were not medically warranted. As we construe Ms. Church's allegations, she is asserting that she "just wanted . . . [her] bladder tied up" and that she did not consent to anything else.

informed consent. *See Blanchard v. Kellum*, 975 S.W.2d 522, 524 (Tenn. 1998). While these causes of action share a common ancestry, the differences between them are more than academic.

A medical battery occurs when a physician performs an unauthorized procedure. Typically, a medical battery involves a physician performing a procedure that the patient did not know the physician was going to perform or a physician performing a procedure on a part of the body other than the one described to the patient. *See Ashe v. Radiation Oncology Assocs.*, 9 S.W.3d 119, 121 (Tenn. 1999). The controlling factual issues in these cases are whether the patient knew the physician was going to perform the procedure and whether the patient authorized the physician to perform it. According to the Tennessee Supreme Court, if the answer to either of these questions is no, a medical battery has been committed. *See Blanchard v. Kellum*, 975 S.W.2d at 524. Because the answers to these questions focus on the patient's knowledge and awareness, patients pursuing a medical battery claim need not present expert evidence to support their claim. *See Blanchard v. Kellum*, 975 S.W.2d at 524.

In contrast, a lack of informed consent violation occurs when the patient is aware that a procedure is going to be performed but is unaware of the potential risks associated with the procedure. *See Ashe v. Radiation Oncology Assocs.*, 9 S.W.3d at 121; *Blanchard v. Kellum*, 975 S.W.2d at 524. The tort does not relate to the manner in which the procedure was performed, but rather to the manner in which the physician obtained the patient's consent to perform the procedure. *See German v. Nichopoulos*, 577 S.W.2d 197, 202 (Tenn. Ct. App. 1978), *rev'd on other grounds*, *Seavers v. Methodist Med. Ctr.*, 9 S.W.3d 86 (Tenn. 1999). These claims are part of the medical malpractice statutes. *See* Tenn. Code Ann. § 29-26-118 (1980). Accordingly, patients seeking damages for lack of informed consent must prove that the physician's conduct fell below the applicable standard of care and that reasonably prudent persons in the patient's position would not have consented to the procedure if they had been suitably informed of the risks, benefits, and alternatives. *See Ashe v. Radiation Oncology Assocs.*, 9 S.W.3d at 122-23.

The inquiry in lack of informed consent cases is whether the physician provided the patient sufficient information to enable the patient to make an intelligent and informed decision either to refuse or consent to the procedure. *See Shadrick v. Coker*, 963 S.W.2d 726, 732 (Tenn. 1998). To prove that the information was insufficient, a patient must present evidence that his or her physician failed to disclose information about the risks of the proposed procedure that a reasonable physician would have disclosed under similar circumstances. *See Ashe v. Radiation Oncology Assocs.*, 9 S.W.3d at 121. This evidence must take the form of expert testimony because it is clearly beyond the common knowledge of laypersons. *See Bryant v. HCA Health Servs. of Tenn., Inc.*, 15 S.W.3d 804, 808-09 (Tenn. 2000); *Blanchard v. Kellum*, 975 S.W.2d at 524; *Harris v. Buckspan*, 984 S.W.2d 944, 948 (Tenn. Ct. App. 1998).

## 2.
### THE FLAWED APPELLATE RECORD

Before we address the substance of Ms. Church's medical battery and lack of informed consent claims, we must turn our attention to a flaw in the appellate record that materially affects

the scope of our review. The parties' briefs contain numerous references to Ms. Church's deposition testimony. While the record indicates that Ms. Church's lawyer may have filed Ms. Church's deposition in the trial court as part of her response to Dr. Perales's summary judgment motion, the deposition was never made part of the record on appeal.[6] This is a material omission because the record contains no other direct evidence of Ms. Church's version of her pre-operative conversations with Dr. Perales.

When this court noted the absence of Ms. Church's deposition during oral argument, Dr. Perales's lawyer endeavored to assume responsibility for the oversight. However, Ms. Church was responsible for ensuring that all parts of the trial court record germane to the issues she intended to raise on appeal were included in the appellate record. *See* Tenn. R. App. P. 24(a), (e); *State v. Banes*, 874 S.W.2d 73, 82 (Tenn. Crim. App. 1993). There was ample opportunity to discover that Ms. Church's deposition was not in the record because the appellate record had been on file with this court and available to the parties for six months prior to oral argument, and Ms. Church's lawyer actually had the record in her possession for two weeks prior to oral argument.

Once the fact that Ms. Church's deposition was not included in the record was brought to her attention, Ms. Church's lawyer could have supplemented the record pursuant to Tenn. R. App. P. 24(e). She did not do so, and as a result, the record contains no testimony by Ms. Church regarding her pre-operative conversations with Dr. Perales. We cannot take judicial knowledge of her testimony, even if parts of it are cited in the briefs, because it is outside the record. *See Richmond v. Richmond*, 690 S.W.2d 534, 535 (Tenn. Ct. App. 1985). Thus, in accordance with Tenn. R. App. P. 36(a), Ms. Church must bear the consequences of absence of her deposition from the record.

**3.**
**THE MEDICAL BATTERY CLAIM**

We need not tarry long with Ms. Church's medical battery claim because she concedes in her brief that she has failed "to establish that Doctor Perales was negligent by performing unnecessary abdominal exploration." We agree. Without Ms. Church's deposition, the record contains no other competent evidence to contradict Dr. Perales's testimony in her affidavit and deposition that she fully explained all anticipated procedures, including the exploratory laparotomy and the salpingo oophorectomy, to Ms. Church and that Ms. Church consented to them.[7] Without this evidence, Ms. Church cannot demonstrate the existence of a material factual dispute regarding her medical battery claim.

---

[6] Only four depositions were included in the appellate record filed with this court. These included the depostions of Drs. Perales, Dunbar, and Ross, as well as the deposition of Dr. Gary J. Wolf, a Lewisburg surgeon, who was Ms. Church's expert witness.

[7] Evidence regarding a medical battery would normally come from the patient, the physician, anyone else present during the conversations between the patient and the physician, as well as any documentary evidence regarding these conversations. Dr. Wolf's recitation of the portions of Ms. Church's deposition he relied on to form his opinion regarding her physicians' conduct is not a satisfactory substitute for Ms. Church's deposition. Dr. Wolf had no firsthand knowledge of the conversations between Ms. Church and Dr. Perales.

Ms. Church's medical battery claim would have been doomed even without the oversight regarding her deposition. To support her summary judgment motion, Dr. Perales produced written consent forms signed by Ms. Church consenting to the exploratory laparotomy and the salpingo oophorectomy. Based on these forms, the only conclusion that reasonable persons could have reached was that Ms. Church consented to these procedures.

A patient's consent may be express or implied. Express consent is permission given directly either by voice or in writing. A party seeking to prove express consent may do so by introducing the writing memorializing the consent. *See*, *e.g.*, *In re Swine Flu Immunization Prods. Litig.*, 533 F. Supp. 567, 574-76 (D. Colo. 1980). When a patient has signed a written consent form expressly covering a particular procedure, the terms of the consent form will ordinarily control the question of whether the patient consented to the procedure. *See Hudson v. Parvin*, 582 So. 2d 403, 411 (Miss. 1991) (holding that the language of an executed consent form took precedence over the alleged prior conversations between the patient and the physician). When a written consent form exists, the courts look to "the metes and bounds of the agreement entered into between [the patient] and [the surgeon] and the parameters of the authorization given." *Samoilov v. Raz*, 536 A.2d 275, 279 (N.J. Super. Ct. App. Div. 1987).

As a general matter, the law presumes that persons who sign documents, having been given an opportunity to read them, are bound by their signatures. *See Solomon v. First Tenn. Bank*, 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989). This rule applies in medical battery and informed consent cases. Thus, the law presumes that patients ordinarily read and take whatever other measures are necessary to understand the nature, terms, and general meaning of consent forms involving medical treatment. *See Karp v. Cooley*, 349 F. Supp. 827, 835 (S.D. Tex. 1972); *Grannum v. Berard*, 422 P.2d 812, 815 (Wash. 1967). This presumption has been codified in many states. *See, e.g., Parikh v. Cunningham*, 493 So. 2d 999, 1001 (Fla. 1986); *Cardio TVP Surgical Assocs. v. Gillis*, 528 S.E.2d 785, 787 (Ga. 2000); *Shahinaw v. Brown*, 963 P.2d 1184, 1188 (Idaho 1998); *Earl v. Ratliff*, 998 S.W.2d 882, 891 (Tex. 1999). Thus, the existence of a signed consent form gives rise to a presumption of consent in the absence of proof of misrepresentation, inadequate disclosure, forgery, or lack of capacity.

Where a physician performs a procedure contracted for by the patient, that treatment, while it may or may not be malpractice, is not battery. *See Hartsell v. Fort Sanders Reg'l Med. Ctr.*, 905 S.W.2d 944, 947 (Tenn. Ct. App. 1995). If an executed consent form expressly covers the surgery performed on the patient, and no evidence competently undermines the validity of that consent,[8] the surgery is not a battery, and the physician is entitled to judgment as a matter of law on any claim of battery. *See Blincoe v. Luessenhop*, 669 F. Supp. 513, 517-18 (D.D.C. 1987); *Adames Mendez v.*

---

[8]Dr. Wolf's opinion that Dr. Perales deviated from the standard of care by performing an unauthorized operation is expressly based on Ms. Church's statements in her deposition that she "didn't want nothing done, as I say, except have my bladder fixed up." We note that Ms. Church has not collaterally attacked the legal validity of the consent forms she signed. She has done little more than change her own story about whether she consented. Litigants cannot create a genuine issue of fact by merely gainsaying themselves at summary judgment stage. *See generally Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *Price v. Becker*, 812 S.W.2d 597, 598 (Tenn. Ct. App. 1991).

*United States*, 652 F. Supp. 356, 359 (D.P.R. 1987) (granting partial summary judgment); *Ipcock v. Gilmore*, 354 S.E.2d 315, 318 (N.C. Ct. App. 1987).

The undisputed evidence shows that Ms. Church read the consent forms. In addition to signing them, she placed her initials near the filled-in blank spaces on the form, and she marked out the provision authorizing blood transfusions, wrote in "No Blood," and then signed her notation. Ms. Church does not take issue with the consent forms or with the circumstances under which she signed them. There is no other competent evidence in the record to prevent the application of the presumption that she consented to the procedures described on the forms.[9] Thus, Dr. Perales is entitled to a summary judgment on Ms. Church's medical battery claim based on the consent forms alone.

**4.**
**THE LACK OF INFORMED CONSENT CLAIM**

Ms. Church's lack of informed consent claim must suffer the same fate as her medical battery claim. Without Ms. Church's deposition, the only competent evidence of the discussions between Ms. Church and Dr. Perales regarding the proposed surgery is Dr. Perales's affidavit and deposition. In her September 18, 1996 deposition, Dr. Perales described her March 2, 1995 discussion with Ms. Church regarding the exploratory laparotomy as follows:

> [I]n her particular case because of her being a Jehovah's Witness, I did not want to take that risk of any bleeding happening and not being able to give her any blood by the time I noticed that she had had some bleeding. Thus I mentioned to her and her daughter - - Katie Spafford was present in the presurgical consultation - - I mentioned to her and her daughter that I would prefer to do the procedure through an exploratory laparotomy where there would be an incision in the abdomen and do the repairs through the abdomen.[10]

In an affidavit filed with the trial court on March 27, 1997, Dr. Perales elaborated on her discussion regarding the removal of Ms. Church's ovaries and fallopian tubes:

> In view of Mrs. Church's religious beliefs and the danger of blood vessel compromise during a laparoscopic approach, I decided to perform the surgical procedures utilizing an exploratory laparotomy

---

[9] We have already determined that Dr. Wolf's opinion testimony is not competent evidence on Ms. Church's medical battery claim. As best as we can determine, Ms. Church attempted to circumvent the signed consent forms at her deposition by impeaching her own signature. Litigants cannot create material factual disputes by merely contradicting themselves at the summary judgment stage. *See Reid v. Sears, Roebuck & Co.*, 790 F.2d at 460; *Price v. Becker*, 812 S.W.2d at 598.

[10] This account is corroborated by Dr. Perales's office notes of her March 2, 1995 consultation with Ms. Church.

approach. The surgical procedure was described to Mrs. Church, including the possible removal of Mrs. Church's fallopian tubes and ovaries. The potential risks and complications of the procedure including infection and bleeding were discussed with Mrs. Church and she agreed to proceed with surgery.

In both her deposition and affidavit, Dr. Perales states unequivocally that Ms. Church consented to these procedures after they were explained to her. To corroborate her account, Dr. Perales points to the hospital's surgical consent forms Ms. Church signed both on March 8, 1995, and March 22, 1995, in which she consented to an exploratory laparotomy, a bilateral salpingo oophorectomy, a bladder suspension, and an anterior and posterior repair.

Dr. Wolf's deposition does not provide the evidence needed to create a genuine issue of material fact regarding Ms. Church's discussions with Dr. Perales. Dr. Wolf was clearly permitted to base his expert opinions regarding the standard of care and causation on evidence outside the record. *See* Tenn. R. Civ. P. 56.06. Thus, he could form expert opinions based on information gleaned from reading Ms. Church's deposition, whether the deposition was part of the record or not. However, Dr. Wolf's recitation of the portions of Ms. Church's deposition on which he relied is not evidence that the conversations occurred as Ms. Church described them.[11] The only competent evidence of these conversations would be the testimony of Ms. Church, Ms. Spafford, Dr. Perales, and anyone else present during the March 2, 1995 pre-surgical consultation or any document memorializing these conversations that would be admissible as an exception to the hearsay rule.

Based on the undisputed evidence in the record before us, we have concluded that the only conclusion that a reasonable person could reach is that Dr. Perales's explanation of the nature of the procedures she intended to perform as well as the risks and benefits of these procedures complied with the standard of care applicable to Dr. Perales. Accordingly, the trial court properly granted the summary judgment dismissing Ms. Church's lack of informed consent claim.

## B.
### THE DELAY IN POST-OPERATIVE DIAGNOSIS AND TREATMENT CLAIM

Ms. Church does not claim that Dr. Perales performed any of the March 22, 1995 surgical procedures negligently or that the perforation of her small intestine at its antimesenteric border was caused by Dr. Perales's negligence.[12] However, she asserts that Dr. Perales was negligent in failing to diagnose and treat the effects of the perforation of her small intestine during the course of her post-operative recovery. This contention is the heart of Ms. Church's medical malpractice claim

---

[11]Dr. Wolf was unable to give an expert opinion regarding the informed consent issue when he was deposed on February 25, 1997, because he had never talked with Ms. Church. However, by the time he executed his affidavit filed with the trial court on May 12, 1997, he had read Ms. Church's deposition and based his expert opinion regarding the informed consent issue based on Ms. Church's statements in her deposition.

[12]Even Dr. Wolf opined that Dr. Perales was not negligent when she perforated the small intestine.

against Dr. Perales. For her part, Dr. Perales gives two responses to this claim. First, she asserts that she owed no duty to Ms. Church when this negligence occurred. Second, she asserts that Ms. Church's expert opinion on causation is "purely speculative." We disagree with both of Dr. Perales's arguments and find that the trial court should not have summarily dismissed Ms. Church's malpractice claim against Dr. Perales for negligently failing to diagnose and treat her perforated intestine.

## 1.
### DR. PERALES'S DUTY TO MS. CHURCH

The existence of a duty owed by the defendant to the plaintiff is a necessary ingredient of every negligence claim, including medical malpractice claims.[13] Accordingly, we turn first to Dr. Perales's assertion that she owed no duty to Ms. Church after March 29, 1995, because she had left Nashville to attend a medical seminar and had turned over Ms. Church's care to Dr. Ross. If Dr. Perales is correct, she is entitled to a dismissal of Ms. Church's malpractice claim as a matter of law. Determining whether Dr. Perales owed a duty to Ms. Church is a question of law. *See Staples v. CBL & Assocs.*, 15 S.W.3d 83, 89 (Tenn. 2000); *Rice v. Sabir*, 979 S.W.2d 305, 308 (Tenn. 1998); *Jackson v. Bradley,* 987 S.W.2d 852, 854 (Tenn. Ct. App. 1998).

The existence of a physician's duty arises out of the professional relationship between the physician and his or her patient. The relationship is generally characterized as a contractual one in which the patient knowingly and voluntarily seeks the professional assistance of the physician, and the physician knowingly agrees to treat the patient. *See Jennings v. Case*, 10 S.W.3d 625, 628 (Tenn. Ct. App. 1999); *Osborne v. Frazor*, 58 Tenn. App. 15, 20, 425 S.W.2d 768, 771 (1968). The physician also agrees to use his or her best judgment and skill in providing treatment. *See Truan v. Smith*, 578 S.W.2d 73, 75-76 (Tenn. 1979); *Redwood v. Raskind*, 49 Tenn. App. 69, 75, 350 S.W.2d 414, 416-17 (1961).

Once a physician accepts a patient, he or she has a duty to continue providing treatment as long as it is medically necessary. *See Hongsathavij v. Queen of Angels/Hollywood Presbyterian Med. Ctr.*, 73 Cal. Rptr. 2d 695, 704 (Ct. App. 1998); *Estate of Katsetos v. Nolan*, 368 A.2d 172, 182 (Conn. 1976); *Surgical Consultants, P.C. v. Ball*, 447 N.W.2d 676, 682 (Iowa Ct. App. 1989); *McLaughlin v. Hellbusch*, 591 N.W.2d 569, 573 (Neb. 1999); *Jackson v. Oklahoma Mem'l Hosp.*, 909 P.2d 765, 774 (Okla. 1995). Accordingly, the Tennessee Supreme Court has held that

> a physician who undertakes the treatment of a case may not abandon his [or her] patient until in his [or her] judgment the facts justify the cessation of attention, unless he [or she] give to the patient due notice that he [or she] intends to quit the case and affords the patient opportunity to procure other medical attendance.

---

[13] *See White v. Lawrence*, 975 S.W.2d at 529; *Bain v. Wells*, 936 S.W.2d 618, 624 (Tenn. 1997); *George v. Alexander*, 931 S.W.2d 517, 520 (Tenn. 1996).

*Burnett v. Layman*, 133 Tenn. 323, 329-30, 181 S.W. 157, 158 (1915).[14] The law imposes this duty on treating physicians in recognition of their responsibility to avoid a lapse in necessary treatment to their patients. *See Rosen v. Greifenberger*, 513 S.E.2d 861, 865 (Va. 1999).

A physician's duty to attend a patient continues as long as required unless the physician-patient relationship is ended by (1) mutual consent, (2) the physician's withdrawal after reasonable notice, (3) the dismissal of the physician by the patient, or (4) the cessation of the medical necessity that gave rise to the relationship in the first place. *See Glenn v. Carlstrom*, 556 N.W.2d 800, 802 (Iowa 1996); *Weiss v. Rojanasathit*, 975 S.W.2d 113, 119-20 (Mo. 1998). While the physician-patient relationship exists, the physician has a duty to continue providing care. Thus, in the absence of an emergency or other special circumstances, where a physician knows or should know that a condition exists that requires further medical attention to prevent injurious consequences, the physician must render such attention, or must see to it that some other competent person does so, until the condition is resolved or until the physician-patient relationship is properly terminated. *See Pritchard v. Neal*, 229 S.E.2d 18, 20 (Ga. Ct. App. 1976); *Reynolds v. Dennison*, 981 S.W.2d 641, 642 (Mo. Ct. App. 1998); *Jackson v. Oklahoma Mem'l Hosp.*, 909 P.2d at 774.

It is neither realistic nor fair to expect that physicians will be able to provide continuous care to each of their patients twenty-four hours a day, seven days a week, and three hundred and sixty-five days a year. The medical profession recognizes that it is appropriate for physicians to arrange for other physicians to cover for them when they will be temporarily unavailable. Accordingly, the courts have held that when a physician is temporarily unable to attend a patient personally, he or she may make arrangements for a competent person to attend the patient in the physician's absence. *See Kenney v. Piedmont Hosp.*, 222 S.E.2d 162, 166 (Ga. Ct. App. 1975); *Manno v. McIntosh*, 519 N.W.2d 815, 821-22 (Iowa Ct. App. 1994); *Tripp v. Pate*, 271 S.E.2d 407, 410-11 (N.C. Ct. App. 1980); *Johnson v. Ward*, 344 S.E.2d 166, 170 (S.C. Ct. App. 1986) *overruled on other grounds*, *Spahn v. Town of Port Royal*, 499 S.E.2d 205, 207 (S.C. 1998); *McCay v. Mitchell*, 62 Tenn. App. 424, 432, 463 S.W.2d 710, 714-15 (1970); *Lee v. Dewbre*, 362 S.W.2d 900, 903 (Tex. Civ. App. 1962).

Even though Ms. Church had initially seen Dr. Perales in December 1993, she and Dr. Perales entered into a physician-patient relationship regarding her gynecological surgery in November 1994 when they agreed to proceed with the surgical option to correct Ms. Church's urinary incontinence and vaginal prolapse. By agreeing to perform these surgical procedures, Dr. Perales, as a matter of law, undertook not only to perform the procedures themselves in a professionally appropriate manner but also to provide Ms. Church with the required post-operative treatment. *See Swaw v. Klompien*, 522 N.E.2d 1267, 1272 (Ill. App. Ct. 1988); *Starnes v. Taylor*, 158 S.E.2d 339, 345 (N.C. 1968).

Dr. Perales's duty to Ms. Church did not end with the completion of the surgical procedures on March 22, 1995. Ms. Church's medical problems had not been finally resolved, and Dr. Perales had a continuing obligation to provide Ms. Church with post-operative treatment. In fact, Ms.

---

[14] This principle is now embodied in T.P.I. 3-Civil 6.15.

Church's medical condition deteriorated alarmingly following surgery. Dr. Perales knew that Ms. Church's condition was critical and that Ms. Church required continuing medical attention to prevent further injurious consequences. In order to assure that there would be no lapse in Ms. Church's care, Dr. Perales arranged for Drs. Ross and Dunbar to cover for her while she was attending an out-of-state medical seminar.

Dr. Perales did not intend to terminate her professional relationship with Ms. Church when she left Nashville to attend the medical seminar. Had she done so, she would have exposed herself to liability for abandonment.[15] Dr. Perales remained Ms. Church's physician. Accordingly, her duty to provide continuing treatment to Ms. Church did not end on March 29, 1995, simply because she left Nashville to attend a conference.

We likewise decline to find that Dr. Perales's duty to Ms. Church ended simply because she arranged for Drs. Ross and Dunbar to cover for her in her absence. The undisputed evidence in this record does not conclusively establish the nature of the legal relationship between Dr. Perales and Drs. Ross and Dunbar regarding Ms. Church's care during Dr. Perales's temporary absence. If Drs. Ross and Dunbar were acting as Dr. Perales's "agents" or if the three physicians were otherwise acting in concert to provide Ms. Church care, then Dr. Perales would share the responsibility, if any, for the delays in diagnosing and treating Ms. Church's bowel perforation and intra-abdominal process occurring on and after March 29, 1995.

**2.**
**MS. CHURCH'S EVIDENCE OF CAUSATION**

Dr. Perales also asserts that she is entitled to a summary judgment because Ms. Church has failed to come forward with the evidence required by Tenn. Code Ann. § 29-26-115(a)(3) that her conduct proximately caused Ms. Church to suffer injuries that would not otherwise have occurred. This argument tests the quality of the evidence Ms. Church used to oppose Dr. Perales's summary judgment motion. Specifically, it challenges the adequacy of Dr. Wolf's expert opinions.

All affidavits used either to support or to oppose a motion for summary judgment must meet the requirements Tenn. R. Civ. P. 56.06 that (1) the affidavit must be made on the affiant's personal knowledge, (2) the affiant's statements must otherwise be admissible in evidence, and (3) the affiant is competent to testify regarding the substance of the affidavit. In addition to these requirements, expert affivadits must demonstrate that the affiant is qualified to render an expert opinion [Tenn. R. Evid. 104(a)] and that the affiant's statements or opinions will substantially assist the trier of fact [Tenn. R. Evid. 702]. *See Knight v. Hospital Corp. of Am.*, No. 01A01-9509-CV-00408, 1997 WL

---

[15] Abandonment is essentially a breach of a physician's duty of continuing treatment. *See King v. Fisher*, 918 S.W.2d 108, 111 (Tex. App. 1996). It involves the complete termination of a physician-patient relationship, s*ee Hartsell v. Ft. Sanders Reg'l Med. Ctr.*, 905 S.W.2d at 949, and it occurs when a physician, without justification, terminates his or her professional relationship with a patient at an unreasonable time or without affording the patient an appropriate opportunity to retain a qualified replacement. *See Tavakoli-Nouri v. Gunther*, 745 A.2d 939, 941 (D.C. 2000); *Glenn v. Carlstrom*, 556 N.W.2d at 803.

5161, at *5-6 (Tenn. Ct. App. Jan. 8, 1997) (No Tenn. R. App. P. 11 application filed). If the affidavit is introduced in opposition to a motion for summary judgment, it must also create some genuine dispute regarding one or more facts that are legally material to the outcome of the case. *See Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 103-04 (Tenn. Ct. App. 1998).

In medical malpractice cases, Tenn. Code Ann. § 29-26-115 imposes five other substantive requirements on expert affidavits. The affiant must demonstrate that he or she meets the geographic and durational residence and practice requirements.[16] Second, the affiant must demonstrate that he or she practices in a profession or specialty that makes the affiant's opinion relevant to the issues in the case.[17] Third, the affiant must demonstrate that familiarity with the recognized standard of professional practice in the community where the defendant practices or in similar communities.[18] Fourth, the affiant must give an opinion concerning whether the defendant physician met or failed to meet the relevant standard of professional practice.[19] Finally, the affiant must opine whether the defendant physician's negligence more likely than not caused the patient injuries that he or she would not otherwise have suffered.[20]

This court has admonished lawyers to couch their medical experts' conclusions in the language of Tenn. Code Ann. § 29-26-115 to avoid summary judgment problems. *See Gambill v. Middle Tenn. Med. Ctr.*, 751 S.W.2d 145, 148 (Tenn. Ct. App. 1988); *see also Mullins v. Jonas*, No. 02A01-9306-CV-00132, 1994 WL 424141, at *3 (Aug. 15, 1994) (No Tenn. R. App. P. 11 application filed); *Keith v. Henson*, No. 01A01-9311-CV-00507, 1994 WL 176925, at *3 (May 11, 1994) *perm. app. denied* (Tenn. Sept. 12, 1994). However, we recognize that a mere ritualistic incantation of statutory buzz words evidences very little. Accordingly, when an expert's opinion is challenged, we will determine whether the opinion is based on trustworthy facts or data sufficient to provide some basis for the opinion. *See generally McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997). We neither assay the expert's credibility nor determine the evidentiary weight that should be given to the experts' opinion. Rather, we merely look to see if the challenged opinion has some legally-acceptable basis from which its conclusions could be rationally drawn. *See Devore v. Deloitte & Touche*, No. 01A01-9602-CH-00073, 1998 WL 68985, at *9-10 (Tenn. Ct. App. Feb. 20, 1998) (No Tenn. R. App. P. 11 application filed) (affirming summary judgment where proffered expert testimony lacked a trustworthy basis). Expert opinions having no basis can properly

---

[16] *See* Tenn. Code Ann. § 29-26-115(b).

[17] *See* Tenn. Code Ann. § 29-26-115(b). The affiant need not practice in the same specialty as the defendant physician. *See Walker v. Bell*, 828 S.W.2d 409, 411 (Tenn. Ct. App. 1991); *Goodman v. Phythyon*, 803 S.W.2d 697, 701-02 (Tenn. Ct. App. 1990).

[18] *See* Tenn. Code Ann. § 29-26-115(a)(1).

[19] *See* Tenn. Code Ann. § 29-26-115(a)(2).

[20] *See* Tenn. Code Ann. § 29-26-115(a)(3); *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993) (the plaintiff must demonstrate that the defendant's negligence more likely than not caused the injury).

be disregarded because they cannot materially assist the trier of fact. Nor can they create genuine disputes of material fact at summary judgment stage.

We have concluded that Dr. Wolf's affidavits and deposition meet all the technical requirements of Tenn. R. Civ. P. 56.06 and Tenn. Code Ann. § 29-26-115. Accordingly, the sole issue to be decided is whether Dr. Wolf's testimony fails to create a material factual dispute regarding whether Dr. Perales's post-operative care of Ms. Church more likely than not caused Ms. Church to suffer injuries that would not otherwise have occurred.

Dr. Wolf's opinions are based on his personal review of Ms. Church's hospital records and the files and depositions of Drs. Perales, Ross, and Dunbar. As an experienced general surgeon with over twenty-five years in practice, Dr. Wolf states that the available records reveal that Ms. Church "did not have a normal usual or even acceptable postoperative course." He points out repeatedly that Ms. Church went "progressively downhill" following surgery. While he concedes that diagnosing an intra-abdominal process can be difficult, he concludes, based on Ms. Church's symptoms and complaints and on the CT scan results obtained on March 29, 1995, that her physicians acted negligently by delaying their decision to perform another exploratory laparotomy until March 31, 1995.[21]

During the post-operative delay in diagnosing and treating her perforated bowel, Ms. Church suffered abdominal pain, nausea, fever, and life-threatening shortness of breath. Ultimately, her condition deteriorated to the point where she required artificial life-support and became too weak for surgery. These undisputed facts provide an adequate basis for Dr. Wolf's opinion that "Dolly Church suffered injuries which would not have otherwise occurred," and Dr. Wolf's opinion is sufficient to create a material factual issue that renders a summary judgment inappropriate.

We respectfully disagree with the trial court's conclusion that Dr. Perales is entitled to a summary judgment dismissing Ms. Church's medical malpractice claims against her. Accordingly, we vacate the portion of the summary judgment dismissing Ms. Church's malpractice claims against Dr. Perales based on her alleged negligent delay in diagnosing and treating Ms. Church's perforated bowel.

### III.
### THE MALPRACTICE CLAIM AGAINST DR. DUNBAR

Ms. Church also insists that the trial court erred by granting the summary judgment dismissing her medical malpractice claims against Dr. Dunbar. In response, Dr. Dunbar asserts that the shortcomings in Dr. Wolf's testimony provide three independent reasons supporting the trial court's decision. Our review of the challenged evidence leads us to reject each of these arguments.

### A.

---

[21]Specifically, he states that "the delay in diagnosis of nine days following the first surgery was excessive considering the clinical evidence."

## DR. WOLF'S FAMILIARITY WITH THE APPLICABLE STANDARD OF CARE

Dr. Dunbar first argues that Dr. Wolf's testimony should be disregarded for summary judgment purposes because he failed to demonstrate that he is familiar with the applicable standard of care as required by Tenn. Code Ann. § 29-26-115(a)(1). She makes this argument despite Dr. Wolf's assertion in his November 15, 1996 affidavit that he is

> familiar with the recognized standard of acceptable professional practice in the medical community of Nashville, Davidson County, Tennessee, and similar communities, for the surgical management, care and treatment of patients such as Dolly Church, as those standards exist now and as they existed in March of 1995.

Dr. Wolf repeated this assertion in his May 10, 1997 affidavit, and added that he is

> familiar with the above referenced standard of acceptable professional practice with regard to the post-surgical management care and treatment of patients, such as Dolly Church, regardless of what specialty the physician may be practicing.

These statements, taken in conjunction with the undisputed evidence regarding Dr. Wolf's professional training, background, and experience, are adequate to stake out a prima facie claim of Dr. Wolf's compliance with the requirements in Tenn. Code Ann. § 29-26-115(a)(1) for rendering an expert opinion.

Dr. Dunbar attempts to undermine these statements using several of Dr. Wolf's statements during his February 25, 1997 deposition. Dr. Dunbar's lawyer questioned Dr. Wolf at some length regarding his practice of referring certain patients to a general surgeon at St. Thomas Hospital in Nashville. Dr. Wolf explained that he made these referrals, not because he could not treat their problems that fell within his domain of general surgery, but because many of these patients had multiple problems and the other necessary specialists were not "genuinely available" in Marshall County. The following exchange occurred during this questioning:

> Q. Do you have a full-time nephrologist on staff at Marshall County Medical Center?
>
> A. Dr. Sue Ellen Lee, whose office is in Columbia, is on active staff at Marshall Medical Center. She runs the dialysis center here in Lewisburg. And she is available.
>
> Again, availability within the bylaws as opposed to genuine availability is a different story. I am within 20 minutes of Maury Regional, and I am therefore on active staff and available. However, if I had a patient like Mrs. Church in the ICU at Maury

-17-

Regional, I would not be comfortable leaving the premises to see my patients in my office here. And therefore some sacrifices have to be made. If you cannot provide the capable care, then the patient has to be transferred to a facility where they can be [capably cared for].

Q. Are you saying that a patient like Dolly Church would have to be transferred from Marshall County Medical Center to Maury Regional?

A. Ultimate - - reviewing the chart, ultimately she could have undergone the same surgery, et cetera. But, yes, by the 27th or so she would have been put in an ambulance and shipped up to St. Thomas for further follow-up, yes.

Based on this exchange, Dr. Dunbar, who like Dr. Wolf is a board certified general surgeon, asserts that Dr. Wolf lacks the necessary knowledge and experience to render an expert opinion regarding what the standard of care required Dr. Dunbar to do to treat Ms. Church between March 29 and March 31, 1995.

The logic of Dr. Dunbar's argument escapes us. If Dr. Dunbar is arguing that there is no evidence in the record that Dr. Wolf has demonstrated that he meets Tenn. Code Ann. § 29-26-115(a)(1)'s requirements, she has overlooked Dr. Wolf's two affidavits in which he states quite clearly that he is familiar with the applicable standard of care.[22] If Dr. Dunbar is arguing that Dr. Wolf conceded that he does not possess the knowledge necessary to formulate an opinion regarding the standard of care in Nashville, she has either misunderstood what Dr. Wolf said in his deposition or has chosen to take Dr. Wolf's statements out of context.

Prior to the exchange on which Dr. Dunbar bases her argument, the following exchange between Dr. Dunbar's lawyer and Mr. Wolf occurred:

Q. Is the reason you're referring them to Dr. Eskin, the general surgeon, is because they have problems within the specialty of general surgery?

A. No. Most of the time the reason is because they've got other medical problems. Marshall Medical Center does not have a pulmonologist. We do not have full-time cardiologists. We have a nephrologist that comes periodically for dialysis. While it can be done, it is a difficult thing to get done. As far as in the field - - in my field of general surgery . . . I feel that the OR and the OR staff is capable of doing anything that I am capable of doing; however, many

---

[22]The statements in these affidavits are, of course, probative evidence at the summary judgment stage. *See Wagner v. Department of Agric.*, 28 F.3d 279, 283 (3d Cir. 1994).

of them [the patients being referred to St. Thomas] have multiple medical problems that the internists do not feel comfortable managing. And, honestly, I do not feel comfortable managing if they do not want to help me with it.

Dr. Wolf's answer clearly demonstrates that the reason why he refers some general surgery patients to St. Thomas is not because he does not know how to treat them, but rather because these patients have other medical problems for which other specialists are not, as a practical matter, available. Dr. Wolf's candid acknowledgment of the practical limitations on a rural practice of medicine does not undermine his assertion that his training, experience, and background have equipped him with the knowledge of the acceptable standard of professional practice for general surgeons working in Nashville or similar communities with regard to the care and treatment of patients like Dolly Church.[23]

## B.
### MS. CHURCH'S CAUSATION EVIDENCE

Dr. Dunbar, like Dr. Perales, challenges the adequacy of the evidence in Dr. Wolf's affidavit and deposition on the issue of causation. We have already pointed out at some length the injuries Dr. Wolf opines Ms. Church suffered because of the delay in diagnosing and treating her perforated bowel. Dr. Wolf stated that Ms. Church experienced further sickness, unnecessary pain, and a significantly extended recuperative period as a result of these delays. At the conclusion of one of his affidavits, Dr. Wolf stated that "[a]ll of the opinions I have expressed herein are based upon a reasonable degree of medical certainly." That assertion is sufficient to create a genuine, material factual dispute sufficient to prevent the granting of a summary judgment,

## C.
### DR. WOLF'S CONTRADICTORY TESTIMONY

As a final matter, Dr. Dunbar asserts that Dr. Wolf's testimony should be disregarded because it is irreconcilably contradictory. While a number of Dr. Wolf's answers in his February 25, 1997 deposition are not free from ambiguity, we do not find that they flatly contradict the later statements in his May 10, 1997 affidavit.

Tennessee follows the rule that contradictory statements by the same witness regarding a single fact cancel each other out. *See State v. Matthews*, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993); *Gambill v. Middle Tenn. Med. Ctr.*, 751 S.W.2d at 149-50. The Tennessee Supreme Court has characterized mutually contradictory statements by the same witness as "no evidence" of the fact sought to be proved. *See Johnston v. Cincinnati N.O. & T.P. Ry.*, 146 Tenn. 135, 160, 240 S.W. 429,

---

[23]Dr. Dunbar's argument, viewed as charitably as we are procedurally permitted, goes essentially to the weight of Dr. Wolf's testimony that he is familiar with the applicable standard of care. Of course, as we have already pointed out, assessing the weight of the evidence is not one of the court's tasks at the summary judgment stage. *See Hilliard v. Tennessee State Home Health Servs., Inc.*, 950 S.W.2d 344, 345 (Tenn. 1997).

436 (1922). However, in order to be disregarded under the so-called cancellation rule, the allegedly contradictory statements must be unexplained and neither statement can be corroborated by other competent evidence. *See State v. Matthews*, 888 S.W.2d at 450; *Gambill v. Middle Tenn. Med. Ctr.*, 751 S.W.2d at 151. When the cancellation rule is invoked at the summary judgment stage to challenge evidence opposing the motion, the courts must view the challenged evidence in the light most favorable to the opponent of the motion.

The dispute on which Dr. Dunbar relies involves Dr. Wolf's opinion concerning when Ms. Church's physicians violated the applicable standard of care. Dr. Wolf stated in his May 10, 1997 affidavit that Drs. Perales, Dunbar, and Ross "deviated from the recognized and acceptable standard of medical care . . . in that they failed to timely diagnose the perforation of the small bowel." He also stated that "the delay in diagnosis of nine days following the first surgery was excessive considering the clinical evidence strongly suggestive of an intra-abdominal process as the source of the patient's problems." However, as a result of skillful cross-examination during his February 25, 1997 deposition, Dr. Wolf stated that applicable standard of care was not violated until March 29, 1995, seven days after Ms. Church's first surgery. We do not believe that these statements are irreconcilably inconsistent in light of the fact that Ms. Church's malpractice claim is for delay in diagnosis and treatment.

Dr. Wolf's testimony regarding when the physicians' delay in diagnosing and treating Ms. Church became negligent is certainly not linear. He resisted the lawyers' efforts to pin him down on a precise date when the failure to diagnose and treat became negligent. Eventually, he stated that the delay became negligent on March 29, 1995, after the return of the results of the second CT scan. At that time, he opined, the standard of care required Ms. Church's physicians to begin preparing Ms. Church for another exploratory laparotomy in order to either rule out or address the existence of an intra-abdominal process. He also opined that this surgery should have been performed on the evening of March 29, 1995, or, at the latest, on the morning of March 30, 1995. Accordingly, he faulted the physicians for waiting until March 31, 1995 to decide to perform another exploratory laparotomy on Ms. Church.

The testimony relied on by Dr. Dunbar to create an irreconcilable conflict for the most part involves Ms. Church's treatment between March 22 and March 29, 1995. The point that Dr. Wolf was tying to make was that Ms. Church's symptoms and the results of her tests did not rule out the possibility that her condition was due to an intra-abdominal process. While Dr. Wolf questioned why the medical records did not indicate that the physicians were actively considering the possibility of an intra-abdominal process, he stated that he could not fault the treatment path the physicians were following prior to March 29, 1995.[24] Viewing the whole of Dr. Wolf's testimony in its most

---

[24] Specifically, Dr. Wolf stated: "But what we have here is a lot of little violations that tended to delay the diagnosis up until the point whereby the 29th when, as I said before, the drop dead point where she should have gone to surgery . . .." Later, he explained that "Prior to [March 29th], rather than [alarm] bells and whistles [going off], little birds may have chirped around. There were definitely things going on in the post-operative course that should have made them [Drs. Perales and Dunbar] aware." Dr. Wolf also described these "violations" as occurring along "a bell-shaped curve" and stated that by March 29, 1995, the physicians were "outside that curve . . . [or] already on the fringes

(continued...)

-20-

favorable light, it seems that the point he was trying to make was that the physicians attending Ms. Church should have decided to perform another exploratory laparotomy by no later than March 29, 1995. As Dr. Wolf put it:

> What I am saying is that up until [March] 29th Dolly Church did not have a normal, usual or even acceptable post-operative course. Many flags were raised questioning it; however, the culmination is with all these flags being raised by the 29th, the fact that she was no longer explored, yes, I feel there's a violation.

A number of Dr. Wolf's opinions lack precision, and this lack of precision may eventually undermine the weight of Dr. Wolf's testimony in the eyes of a jury. However, it is not our task to weigh the evidence at this stage of the proceeding, and we do not find Dr. Wolf's testimony to be so "very flat and unexplained"[25] as to require us to disregard it completely. Thus, to the extent that it found Dr. Wolf's testimony to be irreconcilable and "untrustworthy," as Dr. Dunbar suggests, the trial court erred by disregarding Dr. Wolf's opinions.

## IV.
### THE MALPRACTICE CLAIM AGAINST DR. ROSS

Ms. Church also challenges the trial court's decision to summarily dismiss her malpractice claim against Dr. Ross, the gynecologist who was covering for Dr. Perales after March 29, 1995. Dr. Ross contends that he is entitled to a summary judgment because Ms. Church's evidence does not establish, as Tenn. Code Ann. § 29-26-115(a)(3) requires, that she suffered an injury at his hands that would not otherwise have occurred. We disagree.

Injury is any wrong or damage done to another. *See Vance v. Schulder*, 547 S.W.2d 927, 932 (Tenn. 1977). Legally speaking, to injure another person signifies an act or omission against that person's rights that results in some damage. *See Barnes v. Kyle*, 202 Tenn. 529, 536, 306 S.W.2d 1, 4 (1957). Any want of skillful care or diligence on a physician's part that sets back a patient's recovery, prolongs the patient's illness, increases the plaintiff's suffering, or, in short, makes the patient's condition worse than if due skill, care, and diligence had been used, constitutes injury for the purpose of a medical malpractice claim. *See Boryla v. Pash*, 960 P.2d 123, 129 (Colo. 1998)*; Rogers v. Kee*, 137 N.W. 260, 265 (Mich. 1912); *Bechard v. Eisinger*, 481 N.Y.S. 2d 906, 908 (App. Div. 1984); *Tomcik v. Ohio Dep't of Rehabilitation & Correction*, 598 N.E.2d 900, 902 (Ohio Ct. Cl. 1991).

---

[24] (...continued)
prior to that."

[25] *Southern Motors, Inc. v. Morton*, 25 Tenn. App. 204. 209, 154 S.W.2d 801, 804 (1941).

Dr. Ross supports his argument by pointing to Dr. Wolf's answer to one question in his February 25, 1997 deposition. At one point during the questioning by Dr. Ross's lawyer, the following exchange occurred:

> Q.     Doctor [Wolf], what injury to Mrs. Church did the one-day delay, from the time Dr. Ross became involved in the case until she was actually taken to surgery on March 31st, cause Mrs. Church that she would not have otherwise suffered?
>
> A.     There is no way of knowing.

Based on that answer, Dr. Ross, citing the well-established tenet that a verdict cannot be based on mere speculation, conjecture, and guesswork, *see Sadek v. Nashville Recycling Co.*, 751 S.W.2d 428, 431 (Tenn. Ct. App. 1988), argues that any attribution to him of any of Ms. Church's injuries requires engaging in impermissible speculation.

Dr. Ross's argument overlooks Dr. Wolf's May 12, 1997 affidavit in which Dr. Wolf states that the deviations from the acceptable standard of care by Ms. Church's physicians during her post-operative care "caused Dolly Church to get sicker . . . ." Dr. Wolf's use of the term "sicker" was all-encompassing. Elsewhere in his affidavit, Dr. Wolf details what "sicker" entailed – weight gain, a stretched-out abdomen, abdominal pain, elevated white corpuscle blood count, fever, bodily weakness, body system poisoning, and compromise of body functions. He also opined that the delay in diagnosing and treating Ms. Church's perforated bowel caused her to suffer and prolonged her recovery process. All of these diminutions in Ms. Church's well-being fit the legal concept of injury to the extent that she suffered them due to the wrongful acts of her physicians.

Dr. Wolf explicitly states in his May 12, 1997 affidavit that part of the worsening of Ms. Church's condition occurred between March 29, 1995, and March 31, 1995, after Dr. Ross had started to cover for Dr. Perales. Viewing the evidence most favorably to Ms. Church, she has demonstrated the existence of a triable issue of fact on whether she suffered injury during the time that Dr. Ross was attending her.

It does not matter that Ms. Church's evidence does not establish the full extent of the injuries she may have suffered under Dr. Ross's care. The extent of injury is not a proper inquiry at the summary judgment stage. The law prohibits damages as too speculative only when the existence of damage is uncertain, not when merely the amount of damage is uncertain. *See Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999). Analogously, the plaintiff facing a summary judgment in a medical malpractice case must demonstrate only that he or she has been injured. The question of how much the plaintiff has been injured should be left for the trier of fact. In this case Ms. Church's evidence created an issue of fact concerning whether Dr. Ross injured her. With that material fact in dispute, the trial court should have declined to award Dr. Ross a summary judgment.

**V.**

-22-

Our opinion in this case should not be construed as fixing liability on Drs. Perales, Dunbar, and Ross or even as intimating that Ms. Church has a strong case. We have decided only that the trial court should not have granted the summary judgment to dispose of Ms. Church's medical malpractice claims against Drs. Perales, Dunbar, and Ross based on their alleged delay in diagnosing and treating her perforated bowel and the intra-abdominal process it caused. Accordingly, we affirm the summary judgment dismissing Ms. Church's medical battery and informed consent claims against Dr. Perales and vacate the summary judgments dismissing Ms. Church's medical malpractice claims against Drs. Perales, Dunbar, and Ross. We remand the case to the trial court for further proceedings consistent with this opinion and tax the costs of this appeal jointly and severally to Maria Perales, Laura Dunbar, and Stephen J. Ross for which execution, if necessary, may issue.

_____

WILLIAM C. KOCH, JR., JUDGE