IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 12, 2010 Session

# RUFUS R. CLIFFORD, III AND WIFE, CARRIE C. CLIFFORD v. LOYDA TACOGUE, M. D., ST. THOMAS HOSPITAL, AND ST. JUDE MEDICAL, S.C., INC.

Appeal from the Circuit Court for Davidson County
No. 06C-1413     Barbara N. Haynes, Judge

No. M2009-01703-COA-R3-CV - Filed July 8, 2010

Plaintiff husband alleged that he suffered an injury in the course of undergoing a cardiac catheterization procedure. Plaintiffs filed suit against the treating physician, alleging medical malpractice, lack of informed consent, and medical battery; against the hospital, alleging medical malpractice based on an actual or apparent agency with the physician; and against the manufacturer of the medical device used in the procedure, alleging that the manufacturer was vicariously liable for medical battery committed by its employee. The trial court granted summary judgment to the defendants on all claims, holding that plaintiffs failed to establish that the use of the medical device to close the site where the catheter was inserted was the cause of husband's injury. Finding that the defendants negated the element of causation essential to each cause of action, the trial court's judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL, P.J., M.S. and ANDY D. BENNETT, J., joined.

William Kennerly Burger, Murfreesboro, Tennessee, for the appellants, Rufus R. Clifford, III and Carrie Clifford.

Michael F. Jameson and J. Eric Miles, Nashville, Tennessee, for the appellee, Loyda Tacogue, M.D.

Robert S. Patterson and Amy D. Hampton, Nashville, Tennessee, for the appellee, St. Thomas Hospital.

John E. Anderson, Sr., Nashville, Tennessee, and Edward F. Fox, Carrie L. Hund, and Tiffany M. Quick, Minneapolis, Minnesota, for the appellees, St. Jude Medical S.C., Inc.

**OPINION**

## I. Procedural and Factual History

On June 6, 2005, Rufus Clifford was seen by Dr. Loyda Tacogue, a cardiologist, because he was experiencing some shortness of breath and chest pains. Dr. Tacogue recommended he undergo a cardiac catheterization, also known as an angiogram, which is a procedure that requires insertion of medical instruments into a patient's femoral artery to conduct an examination of the heart and arteries; the last step of the procedure is to close the insertion site to control bleeding. Mr. Clifford agreed to the angiogram and the procedure was performed on June 9 by Dr. Tacogue at St. Thomas Hospital ("St. Thomas"). Dr. Tacogue was not an employee of St. Thomas but was granted privileges to practice medicine there. The angiogram was uneventful and Dr. Tacogue closed the insertion site in Mr. Clifford's femoral artery using an instrument called an "Angio-seal vasular closure device" ("device"), which is used to shorten a patient's recovery time. During the course of the procedure, David Bell, a sales representative for the device's manufacturer, St. Jude Medical, Inc. ("St. Jude"), entered the operating room to provide Dr. Tacogue with the device. After the procedure, Mr. Clifford experienced increasing pain at the insertion site and presented to the St. Thomas emergency room a number of times with severe groin pain, which he alleged to be continuing in nature.

Mr. Clifford and his wife, Carrie, subsequently filed suit against Dr. Tacogue, St. Thomas, and St. Jude, asserting a number claims against each. Mr. Clifford contended that, prior to the angiogram, Dr. Tacogue told him she would be using the "manual pressure" method to control his femoral bleeding and never mentioned the device; that the decision to use the device, in lieu of the "manual pressure" method, was never conveyed to him nor did he authorize its use; that Dr. Tacogue had difficulty with the device and Mr. Bell instructed her on how to use it; that Mr. Clifford did not discover that Mr. Bell was not a medical professional until after the procedure; and that Dr. Tacogue's use of the device damaged a nerve at the insertion site.

St. Jude filed a motion for summary judgment, asserting that the device was not defective, that St. Jude had no duty to obtain Mr. Clifford's consent prior to use of the device, and that Ms. Clifford's consortium claim could not survive the dismissal of her husband's claims. The Cliffords and St. Jude entered into an agreed order to grant St. Jude's motion for summary judgment without prejudice, allowing the Cliffords to file an amended complaint against St. Jude.

The Cliffords thereafter filed an Amended and Supplemental Complaint, re-alleging their claims against all defendants. The Cliffords alleged claims of medical malpractice, lack of informed consent, and medical battery against Dr. Tacogue[1]; medical malpractice against St. Thomas based on the actual or apparent agency of Dr. Tacogue[2]; and medical battery against St. Jude because it was liable for the tortious acts of Mr. Bell under the doctrine of respondeat superior. The claims were based on an allegation that Mr. Clifford's injury resulted from the negligent, unconsented to, and unauthorized use of the device. The Cliffords sought $5,000,000.00 in compensatory damages and $1,000,000.00 in punitive damages for willful battery and/or gross negligence.

On May 20, 2009, the Defendants filed separate motions for summary judgment. In support of her motion, Dr. Tacogue submitted a statement of material fact; the affidavits of Dr. David Uskavitch and herself; an independent medical examination report of Mr. Clifford; the deposition testimony of the Cliffords' expert witnesses, Dr. Louise Ledbetter, Dr. Sam Gammenthaler, and Dr. Aaron Filler; and the evidentiary deposition testimony of Dr. Filler. In support of its motion, St. Thomas submitted a statement of undisputed facts; the affidavits of Dr. Uskovitch and Dr. Tacogue; and the deposition testimony of Dr. Ledbetter, Dr. Gammenthaler, and Dr. Filler. In support of its motion, St. Jude submitted a statement of undisputed material facts; the deposition testimony of Dr. Tacogue, Dr. Ledbetter, Dr. Gammenthaler, and Dr. Filler; and the affidavit of Dr. Filler.

In her memorandum in support of the motion, Dr. Tacogue asserted that the Cliffords "failed to establish causation as a necessary element of their damages claims" because their "expert witnesses ha[d] conceded their inability to establish causation claims with the requisite degree of medical certainty" and because their experts were either not qualified to offer medical causation testimony or lacked the proper foundation to do so. In its memorandum, St. Thomas contended that it "took affirmative measures to inform [Mr.] Clifford that consulting physicians, including Dr. Tacogue, were not its agents or employees," that Mr. Clifford acknowledged this fact in a signed consent form, that the "hospital and its staff did not deviate from the standard of acceptable nursing practice," and that Mr. Clifford cannot "establish a causal connection between <u>any</u> breach of duty by the hospital and its staff and the alleged injury." (Emphasis in original). In its memorandum, St. Jude asserted that Mr. Clifford's "battery claims fail as a matter of law as there was no

---

[1] The complaint also alleged a claim for negligence per se, however, this cause of action was not pursued by the Cliffords thereafter and is not an issue on appeal.

[2] An action for medical battery against St. Thomas does not appear to be mentioned in the amended complaint, however, the trial court granted summary judgment on the claim and the disposition of that claim is an issue on appeal.

touching by the St. Jude representative" and that "[t]here is no competent, admissible evidence that the [device] was the proximate cause of [Mr. Clifford's] alleged injuries." On May 29, 2009, the Cliffords filed a Memorandum of Law in support of their motion for partial summary judgment on the sole issue of medical battery.[3]

After a hearing on June 26, 2009, the trial court entered separate orders disposing of each party's motion for summary judgment. The court granted Dr. Tacogue's motion, finding that the Cliffords' experts failed to establish causation or were not qualified to offer causation testimony. The court granted St. Thomas' motion, finding that there was no proof that Dr. Tacogue was an actual agent or employee of, or was acting under apparent authority of, St. Thomas; that there was no proof that St. Thomas was negligent independent of Dr. Tacogue's actions; that the duty of obtaining informed consent was on the physician, not the hospital, and that Dr. Tacogue obtained informed consent; that Mr. Clifford consented to the procedure and, therefore, no medical battery occurred; and that the Cliffords failed to prove causation with regard to the negligence claims. The court granted St. Jude's motion, finding that Tennessee law does not recognize a cause of action for medical battery against a medical device manufacturer; that the Cliffords failed to prove a "joint venture" or "apparent authority" between "St. Jude (or its sales representative) and any of the other Defendants that would give rise to St. Jude['s] vicarious liability for any alleged medical battery"; and that there was no evidence that the device caused or contributed to any of Mr. Clifford's injuries. The court then denied the Cliffords' motion, finding that they failed to establish undisputed material facts in support of their motion, that they failed to establish causation in support of any of their claims, and that the theories of vicarious liability were unsupported by the undisputed facts and/or were not recognized causes of action or legal theories under established Tennessee law. The Cliffords appeal.

## II. Statement of the Issues

The Cliffords raise the following issues for resolution:

1. Did the trial court err in its failure to grant partial summary judgment to the Cliffords on the issues of battery against Dr. Tacogue, St. Jude, and St. Thomas?

2. Do genuine issues of material fact exist, precluding summary judgment dismissal, on the battery, medical malpractice and informed consent issues

---

[3] The record does not contain the Cliffords' motion for partial summary judgment. In support of the motion, the Cliffords submitted, in part pertinent, a statement of undisputed material facts; the affidavits of Mr. Clifford, Ms. Clifford, Dr. Gammenthaler, and Dr. Filler; and the deposition of Dr. Tacogue,

asserted against Dr. Tacogue, and as to the battery issues asserted against St. Thomas and St. Jude?

3. Do the issues related to causation preclude summary judgment? And, upon the facts presented below, does the presumption created by the doctrine of res ipsa loquitur preclude summary judgment dismissal to the Defendants on the issue of causation?

4. Is the medical testimony of the treating neurosurgeon, Dr. Aaron Filler of Santa Monica, CA, competent testimony pursuant to the requirements of Tenn. Code Ann. § 29-26-115(b)?

## III. Analysis

As stated earlier, the Cliffords alleged that the device was used negligently, thereby causing Mr. Clifford's nerve damage and giving rise to the claims of medical malpractice; that its use was unconsented to, thereby constituting the cause of action based on lack of informed consent; and its use was unauthorized, thereby constituting medical battery. The trial court granted summary judgment to the Defendants on a finding that the Cliffords failed to establish causation for each cause of action asserted; inasmuch as causation is an element of each cause of action, we begin our analysis by considering whether the Defendants successfully negated that element.

To succeed in a claim for medical malpractice, a plaintiff must meet the burden of proof set forth at Tenn. Code Ann. § 29-26-115(a), which provides:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
> (1) The recognized standard of acceptable professional practice in the profession and the speciality thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

*Id*. The necessary element of causation is subsection (a)(3).

With respect to the causes of action for medical battery and lack of informed consent, the Tennessee Supreme Court has recognized a distinction between medical battery, "in which a doctor performs an unauthorized procedure," and lack of informed consent, "in which the procedure is authorized but the patient claims that the doctor failed to inform the patient of any or all [of] the risks inherent in the procedure." *Blanchard v. Kellum*, 975 S.W.2d 522, 524 (Tenn. 1998). The inquiry created to classify these causes of action is: "(1) was the patient aware that the doctor was going to perform the procedure" and "if so (2) did the patient authorize performance of the procedure?" *Id.* "A plaintiff's cause of action may be classified as a medical battery only when [the] answers to either of the above questions are in the negative." *Id.* "If...[the] answers to the above questions are affirmative and if the plaintiff is alleging that the doctor failed to inform of any or all risks or aspects associated with a procedure, a patient's cause of action rests on an informed consent theory." *Id.* In order to recover under either theory, a plaintiff must show some sort of compensable injury and that the injury resulted from the procedure at issue. *Range v. Sowell*, No. M2006-02009-COA-R3-CV, 2009 WL 3518176, at *8 (Tenn. Ct. App. Oct. 29, 2009) (perm. app. denied July 6, 2010) ("When the claim is for medical battery, liability attaches for any injuries resulting from the treatment or procedure not consented to...."); *Shadrick v. Coker*, 963 S.W.2d 726, 732 (Tenn. 1998) ("When the health care provider performs the treatment or procedure without the requisite informed consent of the patient, liability attaches for the resulting injuries...."). Therefore, the Cliffords were required to show that Mr. Clifford suffered a nerve injury that resulted from medical malpractice, or the alleged unauthorized and unconsented to use of the device.

In their motions for summary judgment, the Defendants asserted that the use of the device was not the cause in fact of Mr. Clifford's nerve damage. In support of this contention, the Defendants relied upon the affidavit of Dr. Tacogue,[4] the affidavit of Dr.

---

[4] In her affidavit, Dr. Tacogue stated, in part, that "to a reasonable degree of medical certainty, nothing [she] did or failed to do caused or contributed to cause any injury to Mr. Clifford that otherwise would not have occurred."

-6-

David Uskavitch, a neurologist employed by Vanderbilt University Medical Center,[5] and a report from an independent medical examination.[6]

In addition to her assertion regarding the proximate cause of Mr. Clifford's injury, Dr. Tacogue attacked the Cliffords' expert witnesses by contending that they were not qualified

---

[5] In his affidavit, Dr. Uskavitch, an expert witness for the Defendants, opined, in part pertinent, as follows:

16.  Based upon my education, training and experience, I am familiar with the recognized standard of acceptable professional practice for neurology in the Nashville community in the care and treatment of patients such as [Mr. Clifford] in 2005 and now.  It is my opinion, to a reasonable degree of medical certainty, that there are no objective, clinical findings to support Mr. Clifford's claims of a femoral nerve injury due to cardiac catheterization or otherwise.  In fact, my review of the records reveals no objective, clinical evidence of any nerve injury in Mr. Clifford....Insofar as Mr. Clifford contends that there is such an injury as a consequence of a hematoma suffered during the cardiac catheterization procedure performed by Dr. Tacoque [sic], such hematoma and swelling may occur in the absence of negligence and, in fact, is common following cardiac catheterization procedures.  Insofar as Mr. Clifford contends that he suffered a hematoma and/or swelling as a result of Dr. Tacoque's [sic] use of [the device], it is impossible to ascertain whether the use of the [device] to close the arterial puncture site, which is necessarily required by the angiogram, caused a hematoma in addition to or different from the hematoma and swelling that is a known risk of cardiac catheterization procedures.

17.  Based upon my education, training and experience and my review of Mr. Clifford's medical records, it is my opinion, to a reasonable degree of medical certainty, that nothing that St. Thomas Hospital nursing and other staff did or did not do caused or contributed to cause any injury to Mr. Clifford that would not have otherwise occurred.  Furthermore, the presence of the [device] representative in the procedure room for the close of Mr. Clifford's catheterization procedure did not cause or contribute to cause any injury to Mr. Clifford that otherwise would not have occurred.

[6] On February 5, 2009, Dr. Michael Kaminski conducted an independent medical examination of Mr. Clifford and concluded the following, in part pertinent:

Mr. Clifford has had a long history of chronic unexplained pain. . .His more recent dramatic pain syndrome also cannot be attributed to a definable mechanism reasonably related to his procedure of 6/9/05.  These factors would suggest that his underlying diagnosis is a somatoform pain disorder....The latter connotes a pain disorder in which psychological factors are judged to play a significant role in the onset, severity, exacerbation and maintenance of the pain.  In addition it is also very likely that secondary gain issues are playing a prominent role in his impairment which seems extreme given his benign examination.  I base this opinion on a reasonable degree of medical certainty.

to offer causation testimony.[7] In his response to Dr. Tacogue's Statement of Material Facts, Mr. Clifford admitted that he was relying upon three expert witnesses to support his claims: Dr. Louise Ledbetter, his treating neurologist; Dr. Aaron Filler, his treating neurosurgeon who is located in Santa Monica, California; and Dr. Sam Gammenthaler, a cardiologist licensed to practice medicine in Tennessee.

Dr. Ledbetter testified, and Mr. Clifford conceded, that she was not offering causation testimony.[8] With regard to Dr. Filler, the Defendants argued that he was statutorily prohibited from offering causation testimony pursuant to Tenn. Code Ann. § 29-26-115(b), which provides that:

> No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred.

*Id*. At his deposition, Dr. Filler testified that he is licensed to practice medicine in California, but has never been licensed to practice medicine in Tennessee or its contiguous states.

The Defendants contended that, because neither Dr. Filler nor Dr. Gammenthaler was provided with Mr. Clifford's complete medical records and because neither had sufficient knowledge of the device, they lacked a proper foundation to offer expert causation testimony. The Defendants rely upon this Court's opinion in *Church v. Perales*, 39 S.W.3d 149 (Tenn. Ct. App. 2000), which states that an expert's opinion must be based on "trustworthy facts or data sufficient to provide some basis for the opinion." *Id*. at 166. "Expert opinions having no basis can properly be disregarded because they cannot materially assist the trier of fact," "[n]or can they create genuine disputes of material fact at summary judgment stage." *Id*. In his deposition, Dr. Filler stated that he was testifying as Mr. Clifford's "clinical provider" and that, therefore, he did not review any documents beyond his own chart. Dr. Filler also

---

[7] Although neither St. Thomas nor St. Jude raised this argument in support of their motions for summary judgment, they each filed notices adopting the arguments contained in the memorandum of law filed on behalf of Dr. Tacogue.

[8] In his response to Dr. Tacogue's Statement of Material Facts, Mr. Clifford admitted that "Dr. Louise Y. ("Lucy") Ledbetter has testified that she is offering no causation testimony regarding Plaintiffs' purported injuries."

stated that he had no expertise in cardiac catheterization procedures, had never used or held the device, and had no familiarity with how the device is used or its risks. Dr. Gammenthaler testified that he had not reviewed any records of Mr. Clifford's medical condition prior to the angiogram procedure, that he reviewed a few records after the procedure, that he had not reviewed any medical images, and that he had never met with or examined Mr. Clifford. Dr. Gammenthaler also stated that he had never used or personally seen the device and had not witnessed use of the device firsthand.

Lastly, the Defendants argued that, if Dr. Filler and Dr. Gammenthaler were qualified to provide expert testimony, they either refused to testify on causation or could not conclude that the device caused Mr. Clifford's injuries with a reasonable degree of medical certainty. In support of this contention, the Defendants relied upon Dr. Tacogue's Statement of

Material Facts[9]; the testimony of Dr. Filler from his discovery deposition,[10] and from his

---

[9] In her Statement of Material Facts, Dr. Tacogue made the following assertion, to which Mr. Clifford responded, in part pertinent:

23. [Dr.] Filler believes that injury could have occurred at any of various phases of the catheterization process, including the injection of a local anesthetic at the beginning, potential bleeding at the operative site, local trauma, the injection of dyes, a contaminated catheter, or a local infection. ...
RESPONSE: Admitted, with the caveat that Dr. Filler describes, in his affidavit (¶ 8), "many possible" causes for the type of injuries sustained by Mr. Clifford, bu[t] that the "probable" cause (based upon the factual history related by Mr. Clifford) was the trauma described by Mr. Clifford.

[10] The full transcript of this deposition is not a part of the record on appeal and we are able to review only the excerpts of testimony submitted by the parties in support of their motions. The following testimony provided by Dr. Filler is taken from these excerpts:

Q. And is - - so is your understanding of your role here today is, it's not as an expert witness. It's as - - as the clinical provider?
A. That's correct.
***
A. ...I really am trying to be a percipient witness here....
Q. ...I want to make sure I understand what..."percipient witness" means.
A. At least my understanding of it, my doctor's understanding, at least in California, is that we have either you're an expert witness...where you have an opinion and you rely on all kinds of sources, and then you have a percipient witness which just says that I'm taking care of the patient and I saw this, I examined him, he told me this, this is what I found, this is what I did. And then when you come back to me for testimony, I'm really only going to be testifying about what I saw and what I did...[I]n this case, I'm really just aware of what the patient has described.
***
Q. Is it fair to say, Dr. Filler, that if you are asked to render causation opinions, that you rely first upon the patient's description of his medical history?
A. Well, I wouldn't - - I wouldn't render a causation opinion. I can just tell you what I think you have at the moment, what you're telling me your symptoms are, and I can repeat back what the patient told me about the history. But I wouldn't have any basis to do any causation opinion, other than to comment that if a patient says, well, this happened to me, then I'm happy to percipiently [sic] - - as a percipient witness, say, oh well, if that happened to you, it could have caused this.
***
Q. So in this case, you can see a causal connection between Mr. Clifford's condition and medical treatment he received, but unless you know the full panoply of records and providers and history, you can't make it the cause?
A. Yeah, 'cause when you come back and say "with reasonable medical certainty," no...I can't say that.

evidentiary deposition[11]; and the testimony of Dr. Gammenthaler from his deposition.[12]

In their response to the Defendants' motions and supporting materials on the issue of causation, the Cliffords asserted that "Dr. Tacogue committed medical malpractice. . .by causing nerve damage []as confirmed by Dr. Gammenthaler, Dr. Filler, and by [Dr.] Tacogue's own admission to Mr. and Mrs. Clifford, that she had caused damage to the nerves in the area of the femoral artery"; this contention was not supported by citation to any

---

[11] The full transcript of the evidentiary deposition taken of Dr. Filler is a part of the record on appeal and Dr. Filler testified as follows, in part pertinent:

Q. And you previously testified that any one or more of those possible causes that we just listed could have occurred at any one of several stages of the catheterization procedure. Do you recall that as your testimony?
A. Yes.
Q. And you are not able to determine which of those possible causes resulted in the nerve adhesions that you observed in Mr. Clifford; is that true?
A. That's correct.
Q. And you are also not able to determine at what stage of the catheterization procedure the nerve adhesions may have occurred; is that true?
A. Or at least, yeah, the conditions that led to them. It's hard to know at what point that happened; right.
Q. Okay. And you are not saying that the [device] caused the nerve adhesions that you observed in Mr. Clifford; is that true?
A. No, I am not saying that. It could have. I am not sure exactly how.
Q. And maybe I will ask it this way: You can't say to a reasonable degree of medical certainty that it was the [device] or Dr. Tacoque's [sic] deployment of the [device] that caused Mr. Clifford's alleged injuries; is that correct?
A. That's correct.

[12] The full transcript of Dr. Gammenthaler's testimony is not available in the record on appeal and we are able to review only the excerpts submitted by the parties in support of their motions. The following testimony provided by Dr. Gammenthaler is taken from these excerpts:

Q. You referenced the development of hematoma, but...we've discussed already that a hematoma...can and does arise after cardiac catheterization procedures whether or not there's [a device], right?
A. Correct.
Q. Okay. So the presence of a hematoma, in and of itself, does not implicate that the [device] caused the hematoma?
A. Correct.
***
Q. Okay. Can you determine at this point whether Mr. Clifford's injuries were caused by the use of the [device] or by the cardiac catheterization itself?
A. No.

-11-

evidence. Upon a review of the record, we believe that they were most likely relying upon the affidavits of Ms. Clifford,[13] Mr. Clifford,[14] Dr. Filler,[15] and Dr. Gammenthaler,[16]

_____

[13] In her affidavit, Ms. Clifford stated, in part pertinent, that "I solemnly swear, under the oath that I have given, that Dr. Tacoque [sic] stated to my husband, and to me, (more than once) that she knew that she had somehow 'damaged the nerve' (stating it was the femoral nerve)."

[14] In his affidavit, Mr. Clifford provided the following statements, in part pertinent:

...Within moments, Dr. Tacoque [sic] appeared to begin inserting the device at the insertion site in my femoral artery. At that point, I became extremely alarmed because of Dr. Tacoque's [sic] demeanor. Although she did not verbally express the problem which she had encountered, she appeared (by her general demeanor) frustrated and concerned. I do not recall her exact words, but I recall her making a comment to the man (who I assumed was a doctor), at which time he leaned over the table, directly above my mid-section, and stated to her "no, no, not that way - push harder, push harder." ...
***
10. Dr. Tacoque [sic] came to my room [in the hospital] on June 17, 2005 and attempted to reassure me and my wife that the problem was not serious. However, she specifically admitted to my wife and me that she had "damaged the nerve," but that such problems are not that unusual, and that my problem would be resolved in a month to six weeks. . .I state under oath, and under the penalty of perjury, that Dr. Tacoque [sic] unequivocally and specifically admitted that she had "damaged the nerve" at some point in the procedure, but that it was not a problem which justified any long-term concern, although she understood why I was in pain and upset.

[15] In his affidavit, Dr. Filler made the following statements, in part pertinent:

8. It must be noted and conceded that there are many possible factors which can cause the "multiple-nerve entrapment problem"...However, based upon: (a) Mr. Clifford's emphasis that he had experienced no similar right femoral pain prior to the surgery; (b) Mr. Clifford's detailed history regarding [Dr. Tacogue's] difficulty in inserting the [device] in his femoral artery at the conclusion of the angiogram (which he was fully conscious and awake); (c) the absence anywhere in the medical records exhibited for my review thus far of any other probable or likely cause of the nerve entrapment problem, it is my opinion that it is more probable than not that events associated with the use of the [device] are the likely cause of the nerve problems....Again, it must be noted that there are other possible causes which would result in the condition....However, where a patient describes, in his history, insertion of [the device] into the femoral artery, with the attending cardiologist describing (in the presence of the patient) difficulty in placing the [device], that history (in the absence of any other factors appearing in the medical records) may be reasonably assumed to be the more probable cause of the patient's complaints....

[16] In his affidavit, Dr. Gammenthaler made the following statements, in part pertinent:

21. It is further my opinion, based upon reasonable medical certainty, and upon a standard

(continued...)

-12-

and the depositions of Dr. Filler and Dr. Gammenthaler.[17]  At the trial court level, the

---

[16](...continued)
of "probability" and "more likely than not" ("greater than 50% likelihood") that the deployment of the [device] by Dr. Tacoque [sic], and the resistence which she encountered, constituted excessive trauma through the use of the device which impacted on the nerves situated in the vicinity of the femoral artery in a permanent and disabling manner....While I am entirely comfortable in expressing a causation opinion on the relation of the [device] installation to the nerve trauma apparently experienced by Mr. Clifford, I would defer to the treating neurosurgeon (Dr. [Filler]) regarding the issues of permanency, and the exact anatomical development of the nerve entrapment disorder which purports to relate to the trauma caused by Dr. Tacoque [sic].  No objective medical record has been exhibited to me which describes (on the date of the surgery, or in the ensuing re-hospitalization) confirming documentation that the nerve injury resulted from the [device] installation, as opposed to other possible events in a catheterization....In the present matter, it is reasonable and appropriate to accept the patient's description (as a hypothetical premise) and conclude that a causal relationship exists between the apparent permanent nerve injury sustained by Mr. Clifford, and the attempts by Dr. Tacoque [sic] to "push harder" when she encountered "resistence" ...

[17] As stated earlier, Mr. Clifford did not cite to testimony from Dr. Filler's and Dr. Gammenthaler's depositions to support his position; he did, however, respond to certain statements contained in Dr. Tacogue's Statement of Material Facts with citation to the depositions and affidavits.  Dr. Tacogue's statements, and Mr. Clifford's responses, in part pertinent, are as follows:

11.  Dr. Gammenthaler is unable to determine whether Plaintiff's injuries were caused by the use of the [device] or by the cardiac catheterization itself. ...
RESPONSE: Denied.  Gammenthaler Deposition...

"I think that the - the information that I have received thus far and the follow up information, which strongly support a - an allegation of our, at least, supporting statement from me that said there was a deployment that was more likely than not excessively traumatic of that device."

Also, Gammenthaler Deposition. . ."weight of the evidence...suggests that there was excessive force, excessive trauma as the approximate [sic] cause in the placement of the [device] - the approximate [sic] cause of his problem". . .It is admitted that Dr. Gammenthaler states. . .that he could not conclusively rule out that the catheterization itself had caused the nerve damage, but that, on the history clarified in the foregoing excerpts, trauma from the "pushing" of the [device] caused the damage.
***
20.  In this action, Dr. Filler states that he "wouldn't render a causation opinion", and that he "wouldn't have any basis to do any causation opinion."  Dr. Filler states that "to give an opinion about causation, you have to know the whole story."  Dr. Filler states that he "cannot offer causation opinions" and that the "causation opinion in a legal case tries to look at all things happening. . ." ...

(continued...)

-13-

Cliffords did not address the Defendants' contentions that Dr. Filler and Dr. Gammenthaler were not qualified to provide causation testimony or that they lacked a proper foundation to do so.

"The moving party is entitled to summary judgment only if the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits...show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008) (quoting Tenn. R. Civ. P. 56.04). "The moving party may make the required showing and therefore shift the burden of production to the nonmoving party by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial." *Id*. (citing *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008)). "If the moving party fails to make this showing, then 'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Id*. (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

If the moving party meets its burden, then the "nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist." *Martin*, 271 S.W.3d at 84 (citing *McCarley*, 960 S.W.2d at 588). The nonmoving party's burden may be satisfied by:

> (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.0[7].

---

[17](...continued)
RESPONSE: Denied, Dr. Filler's Affidavit ¶ 8. Further, the excerpts cited, in context, confirm that Dr. Filler was responding to a question conditioned upon Dr. Filler's need to review pre-existing medical records which would have not been shown, by any witness, to be relevant to Mr. Clifford's June 9, 2005 injury.
21. Dr. Filler contends that he cannot offer causation testimony in this case "with reasonable medical certainty." ...
RESPONSE: Denied..., for the reason referenced above, which implied, and suggested, the existence of medical records which document a similar pain syndrome before the [device] incident. No such document exist, and the question to Dr. Filler []directly disputing his affidavit statement, was **conditioned** upon circumstances which have not been shown to be true or accurate.

*Id.* (citing *McCarley*, 960 S.W.2d at 588). This Court must "review the evidence in the light most favorable to the nonmoving party and to draw all reasonable inferences favoring the nonmoving party." *Id*. (citing *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000)).

While the Defendants disputed the fact that Mr. Clifford suffered any injury in their Memoranda of Law, none of them based their summary judgment motion on the negation of this element; rather the Defendants relied solely on negating the element of causation. We find there is a genuine issue of fact as to whether Mr. Clifford suffered an injury;[18] however, since this Court reviews evidence "in the light most favorable to the nonmoving party" for purposes of summary judgment, we resolve this issue in favor of Mr. Clifford's assertion that he suffered an injury as we consider the propriety of summary judgment granted to the Defendants. *Martin*, 271 S.W.3d at 84. With respect to our consideration of the Clifford's motion for partial summary judgment on the medical battery claim, we find that there is a genuine issue of material fact as to whether Mr. Clifford suffered an injury as a result of the cardiac catheterization procedure.

The materials submitted by the Defendants in support of their motions for summary judgment were sufficient to negate an essential element of the Cliffords' claims, *viz.,* that Mr. Clifford's injury was caused by the use of the device. The affidavits of Dr. Tacogue and Dr. Uskavitch and the report from the independent medical examination stated that there was no causal connection between the use of the device and Mr. Clifford's nerve damage. In addition, the excerpts of the depositions of the Cliffords' expert witnesses filed by Defendants supported their contention that the Cliffords could not show causation because the experts either refused, were not qualified, or were unable to provide causation testimony. Dr. Ledbetter admitted that she would not be opining on causation in this matter. Dr. Filler was not qualified to offer a causation opinion pursuant to Tenn. Code Ann. § 29-26-115(b) because he was not a physician practicing in Tennessee or a contiguous state. Nevertheless, Dr. Filler testified that he was serving as a "percipient witness" in this matter, that he was testifying as Mr. Clifford's "clinical provider," and not as an expert witness. Lastly, Dr. Gammenthaler testified that he did not have the benefit of reviewing Mr. Clifford's complete medical history, which excluded some medical records and all medical imaging, and admitted in his affidavit that the medical records he was provided could not confirm the use of the

---

[18] The Defendants' relied on Dr. Uskavitch's affidavit, which concluded that his records "reveal[ed] no objective, clinical evidence of any nerve injury," and Dr. Kaminski's independent medical examination report, which found that Mr. Clifford's "underlying diagnosis is a somatoform pain disorder" in which "psychological factors...play a significant role in the onset, severity, exacerbation and maintenance of pain." The Cliffords' relied upon Dr. Filler's affidavit, which concluded that Mr. Clifford suffered from a "multiple-nerve entrapment problem," and Dr. Gammenthaler's affidavit, which stated that Mr. Clifford suffered "excessive trauma" as a result of the device's impact on the nerves in the "vicinity of the femoral artery."

device as the cause of the injuries. He also testified that he could not "determine...whether Mr. Clifford's injuries were caused by the use of the [device] or by the cardiac catheterization itself."

Having had an essential element of their claims negated, the burden then shifted to the Cliffords to either come forward with evidence establishing material factual disputes that were over-looked or ignored by the Defendants, produce additional evidence establishing the existence of a genuine issue of fact for trial, rehabilitate the evidence attacked by the Defendants, or explain the need for further discovery. *See McCarley*, 960 S.W.2d at 588; *Byrd*, 847 S.W.2d at 215; *Hannan*, 270 S.W.3d at 8-9. We find that the Cliffords failed to meet their burden of presenting such evidence. The Cliffords offered no evidence to re-establish Dr. Ledbetter's or Dr. Filler's qualification to provide causation testimony. Dr. Gammenthaler, as stated earlier, could neither determine an objective cause for Mr. Clifford's injury from his medical records nor could he determine at which point in the angiogram procedure the injury occurred. While Dr. Gammenthaler does conclude in his affidavit that the use of the device "more likely than not" caused Mr. Clifford's injury, he stated that this conclusion was largely based on Mr. Clifford's recitation of the procedure, which Dr. Gammenthaler describes as a "hypothetical premise."[19] Lastly, while Mr. and Ms. Clifford assert in their affidavits that Dr. Tacogue admitted that she caused Mr. Clifford's injury, the affidavits present no evidence to suggest that the injury resulted from her use of the device; rather, the Cliffords stated that Dr. Tacogue "*somehow* 'damaged the nerve'" and that she "'damaged the nerve' *at some point in the procedure*." (Emphasis added).

---

[19] "The causation of a medical condition must be established by testimony from a medical expert." *Jackson v. Allen*, No. M2000-01673-COA-R3-CV, 2002 WL 661930, at *2 (Tenn. Ct. App. April 23, 2002). "[A] medical expert must determine that a causal connection exists between [the event in question] and the injury to 'a reasonable degree of medical certainty.'" *Id.* "Those 'magic words,' however, need not be used for the expert opinion to suffice as proof of causation," but rather, "the testimony must show, as a whole, that it is more probable than not that the [event] caused the injury." *Id.* "The mere possibility of a causal relationship, without more, is insufficient to qualify as an admissible expert opinion." *Lindsey v. Miami Dev. Corp.*, 689 S.W.2d 856, 861 (Tenn. 1985). Even though Dr. Gammenthaler used the words "reasonable medical certainty," "probability," and "more likely than not" to establish the standard upon which his conclusion regarding causation was based, his opinion was still required to show, "as a whole," that it was more probable than not that the use of the device caused Mr. Clifford's injury and that the use of the device was not just one possible cause of his injury; this he was unable to do. Dr. Gammenthaler admitted that his opinion was based solely on Mr. Clifford's description of the procedure and that he found no medical records to support this "hypothetical premise." He also stated that he was unable to determine, from the medical records, whether "the nerve injury resulted from the [device], as opposed to other possible events in a catheterization." Since Dr. Gammenthaler could not objectively distinguish the use of the device as the cause of Mr. Clifford's injury from the rest of the angiogram procedure and since he based his conclusion solely on Mr. Clifford's description of the procedure, which could not be confirmed by the medical records, we find that his opinion only offered a *possibility* as to the cause of his injury and, therefore, was insufficient to create an issue of fact regarding causation in fact. *See Lindsey, supra.*

-16-

In their brief on appeal, the Cliffords assert, for the first time, the theory of *res ipsa loquitur* to establish causation. They contend that, while their experts "acknowledge[d] that there [wer]e multiple 'potential, possible' causes for the nerve damage" and "conceded that the medical records provide[d] no **objective** basis for discerning or pinpointing the exact mechanism involved," "both experts consistently state[d] that causation is supported by the facts related by Mr. Clifford" that he "entered the routine angiogram procedure with no femoral nerve damage, and emerged from that procedure...with a searing femoral pain." (Emphasis in original). The Cliffords also address for the first time the Defendants' contention that Dr. Filler and Dr. Gammenthaler were unable to provide causation testimony because they were not qualified or lacked a foundation. The Cliffords assert that Dr. Filler and Dr. Gammenthaler were provided with sufficient foundation upon which to provide causation testimony and that the waiver provision of Tenn. Code Ann. § 29-26-115 should apply to allow Dr. Filler to testify[20]; as noted above, neither of these contentions were presented in the court below.

"[I]ssues not raised in the trial court cannot be raised for the first time on appeal." *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991). "This Court can only consider such matters as were brought to the attention of the trial court and acted upon or permitted by the trial court." *Irvin v. Binkley*, 577 S.W.2d 677, 679 (Tenn. Ct. App. 1978) (citing *Clement v. Nichols*, 209 S.W.2d 23 (Tenn. 1948)). Because the Cliffords did not raise the issue of *res ipsa loquitur* with the trial court, we are unable to consider their reliance on the theory to establish causation.[21] For the same reason, their assertion that their experts had a proper foundation to provide causation testimony and their application of the waiver provision of Tenn. Code Ann. § 29-26-115 to qualify Dr. Filler to provide causation testimony cannot be considered.[22]

---

[20] Tenn. Code Ann. § 29-26-115(b) states that the court "may waive this subsection (b) when it determines that the appropriate witnesses otherwise would not be available."

[21] "[R]es ipsa loquitur is a form of circumstantial evidence that permits, but does not compel, a jury to infer negligence from the circumstances of an injury." *Seavers v. Methodist Med. Ctr.*, 9 S.W.3d 86, 91 (Tenn. 1999). A plaintiff asserting the theory of *res ipsa loquitur* "must demonstrate that he or she was injured by an instrumentality that was within the defendant's exclusive control and that the injury would not ordinarily have occurred in the absence of negligence." *Id. See also* Tenn. Code Ann. §§ 29-26-115 (c) and (d). Our review, of course, is confined to the record of pleadings and proceedings in the court below and, even if we were to address this issue, we could not assume that the parties would have been afforded the opportunity to develop the record sufficient for our disposition of the issue.

[22] Assuming, *arguendo*, that this Court was able to consider the waiver provision of this statute, we nevertheless find that the Cliffords failed to meet their burden for invoking it. The Cliffords assert that, "[a]s a treating physician who performed two surgeries..., Dr. Filler, as a specialist with unique knowledge of Mr.

(continued...)

Consequently, we find that the Defendants successfully negated the causation element of each cause of action and that the Cliffords did not establish a genuine issue of material fact to preclude summary judgment to the Defendants. We further find that the evidence presented by the Cliffords failed establish their entitlement to judgment as a matter of law on their claim of medical battery. As noted herein, the other issues raised by the Cliffords are without merit.

## V. Conclusion

For the reasons set forth above, the trial court's judgment is AFFIRMED. Costs of this appeal are assessed against the Cliffords for which execution may issue if necessary.

_____
RICHARD H. DINKINS, JUDGE

---

[22](...continued)
Clifford's problems, cannot be supplanted by a Tennessee (or a contiguous state) specialist [that] possess[es] the same insight as Dr. Filler." "Unique knowledge" of an expert, however, is not sufficient to invoke the waiver provision and, instead, there must be proof that an appropriate witness was unavailable; this the Cliffords did not do. Consequently, they failed to successfully invoke the waiver provision of Tenn. Code Ann. § 29-26-115(b). *Steele v. Berkman*, No. M2005-02935-COA-R9-CV, 2006 WL 627185, at *2 (Tenn. Ct. App. Mar. 14, 2006) (declining to waive the contiguous state requirement because the plaintiff "made no effort to find," and presented "no proof regarding the availability of[,] an appropriate expert from Tennessee or a contiguous state.").