IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 6, 2019 Session

## LINDA BRIDGES v. LIFFORD L. LANCASTER, M.D., ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 16C3200     Thomas W. Brothers, Judge**

_____

### No. M2019-00352-COA-R3-CV

_____

This is a health care liability action.  The trial court determined that Plaintiff's evidence did not establish that any act or omission of Defendant caused Plaintiff to suffer an injury that would not have otherwise occurred.  The trial court awarded summary judgment to Defendant physician.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

Bill M. Wade, Memphis, Tennessee, for the appellant, Linda Bridges.

Renee L. Stewart, Nashville, Tennessee, for the appellee, Lifford L. Lancaster, M.D.

## OPINION

### I.   FACTS & PROCEDURAL HISTORY

This appeal arises from an award of summary judgment to Defendant Lifford L. Lancaster, M.D., ("Dr. Lancaster") in a health care liability action.  The background facts relevant to our disposition of this appeal are not disputed.  In December 2018, Linda Bridges ("Plaintiff") filed a complaint for medical malpractice against Dr. Lancaster and HTI Memorial Hospital Corporation, d/b/a Tristar Skyline Medical Center ("Tristar"; collectively, "Defendants"), in the Circuit Court for Davidson County.  In her complaint, Plaintiff stated that on October 5, 2015, she underwent surgery performed by Dr. Lancaster at Tristar to install an arteriovenous graft in her upper left arm for future dialysis treatment.  She alleged that she complained to the nurses in the recovery room of severe and increasing pain in her left hand.  She was discharged on the night of October

5, but returned to the Emergency Room ("ER") several hours later complaining of "excruciating pain in her left hand." The ER physician noted that she had no radial pulse in her left forearm and wrist. The ER physician informed Dr. Lancaster, who instructed that Plaintiff follow-up in his office in one to two days. Plaintiff called Dr. Lancaster on October 7, and Dr. Lancaster performed a second surgery to remove the graft on October 8. Plaintiff continued to complain of severe pain in her left hand and the record establishes that a Venous Doppler was performed on October 12. On October 14, a consulting physician documented that Plaintiff had no ulnar pulse in her left arm. Neither an arteriogram nor CT angiogram imaging was performed. Due to ischemia in her hand, on October 29 Plaintiff underwent surgery to remove two fingers and part of a third finger. In her complaint, Plaintiff stated that she also lost most of the function and feeling in her left hand.

Plaintiff alleged in her complaint that either Tristar's employees and agents or Dr. Lancaster breached the applicable standard of care by discharging her from the hospital on October 5 despite her complaints of severe and increasing pain in her hand. She further alleged that Dr. Lancaster breached the standard of care by instructing her to follow-up in his office in one to two days and by failing to perform an arteriogram or other imaging study to determine why she "progressed from lacking a radial pulse to lacking an ulnar pulse." She asserted that, but for the Defendants' acts and omissions, she would have full use of and sensation in her left hand, and that Defendants' breach of the standard of care constituted the proximate cause of her injury. Plaintiff prayed for a trial by jury, compensatory damages to be determined by the jury, interest, and costs.

Tristar answered on January 18, 2017, denying allegations of negligence against it and asserting the doctrine of comparative fault against Dr. Lancaster. Dr. Lancaster answered on March 2, 2017. Dr. Lancaster denied all allegations of negligence and "affirmatively state[d] that nothing he allegedly did or failed to do caused the condition, injuries and damages alleged in [Plaintiff's] complaint." He also asserted the doctrine of comparative fault against Tristar.

In June 2018, Plaintiff filed a notice of expert disclosures. In her notice, Plaintiff stated that she expected to call Carl Maltese, M.D. ("Dr. Maltese"), as an expert witness; asserted that Defendants had failed to provide information requested in discovery; and summarized Dr. Maltese's conclusions regarding her allegations of negligence and causation. Following a case management conference in September 2018, the trial court set the matter for a trial by jury in February 2019 and ordered the parties to complete discovery on or before December 30, 2018. On November 2, 2018, Dr. Lancaster filed a motion to compel deposition of Dr. Maltese. The trial court granted the motion on November 29 and ordered Plaintiff to make her expert available before December 30, 2018.

On December 7, Dr. Lancaster filed a motion for summary judgment supported by

a statement of undisputed facts, memorandum of law, and his own affidavit attesting to compliance with the standard of care and lack of causation. In his statement of undisputed facts, Dr. Lancaster asserted that Plaintiff had been unable to produce Dr. Maltese for deposition and that it was unlikely that Dr. Maltese could be deposed before the December 30 deadline. He further asserted that the undisputed facts therefore demonstrated that no allegedly negligent act or omission on his part caused Plaintiff an injury that would not have otherwise occurred. Dr. Lancaster filed a motion to exclude Plaintiff's expert on December 21, 2018. In his motion, Dr. Lancaster stated that, on December 19, he was informed that Dr. Maltese would be available on December 28 at 3:00 p.m., and that defense counsel agreed to the December 28 date provided the deposition started by 2:00 p.m. at the latest.

Tristar moved for summary judgment in December 2018, and the parties filed an agreed order awarding summary judgment to Tristar on the issue of breach of care on January 18, 2019. The agreed order was made final pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure.

Dr. Maltese was deposed on December 28, 2018, beginning at 2:30 p.m., and Dr. Lancaster filed a motion to strike his motion to exclude. On January 14, 2019, Plaintiff filed a response to Dr. Lancaster's motion for summary judgment. In her response, Plaintiff pointed to Dr. Maltese's deposition to establish a genuine issue of material fact with respect to breach of care and causation. Dr. Lancaster filed a reply to Plaintiff's response on January 16. In his reply, Dr. Lancaster renewed his assertion that Plaintiff could not establish that any act or omission on his part caused Plaintiff to suffer any injury that she would not otherwise have suffered. Dr. Lancaster attached a portion of Dr. Maltese's deposition in support of his argument.

Dr. Maltese's deposition was filed in the trial court on January 18, 2019, and the trial court heard Dr. Lancaster's motion for summary judgment the same day. The trial court concluded that Plaintiff had failed to demonstrate that any act or omission by Dr. Lancaster caused her any injury that would not have otherwise occurred and that, accordingly, no genuine issue of material fact remained with respect to causation. The trial court awarded summary judgment in favor of Dr. Lancaster by order entered January 30, 2019, and Plaintiff filed a timely notice of appeal to this Court.

## II. ISSUE PRESENTED

Plaintiff presents one issue for our review:

Did the Appellant offer sufficient expert proof of causation to sustain a Healthcare Liability Action under Tennessee Law?

## III.  STANDARD OF REVIEW

Appellate review of a lower court's disposition of a motion for summary judgment is *de novo* upon the record with no presumption of correctness.  *Kershaw v. Levy*, 583 S.W.3d 544, 547 (Tenn. 2019) (citation omitted).  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Tenn. R. Civ. P. 56.04.  If the party moving for summary judgment "does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense."  *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 264 (Tenn. 2015) (emphasis in original).  The party opposing a properly supported motion for summary judgment "'may not rest upon the mere allegations or denials of [its] pleading,' but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, 'set forth specific facts' *at the summary judgment stage* 'showing that there is a genuine issue for trial.'"  *Id.* at 265 (emphasis in original) (quoting Tenn. R. Civ. P. 56.06).  "The nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Id.* (quoting *Matsushita Elec. Indus. Co.,* 475 U.S. at 586, 106 S. Ct. 1348 (1986)).  Rather, "[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party."  *Id.*

The party moving for summary judgment is not required to negate every element of the Plaintiff's claim.  *Cotten v. Wilson*, 576 S.W.3d 626, 637 (Tenn. 2019) (citing *Shipley v. Williams*, 350 S.W.3d 527, 567 (Tenn. 2011)).  If the moving party negates one required element of the Plaintiff's claim, summary judgment may still be granted notwithstanding the existence of other elements of the claim.  *Id.*  It is well-settled that we must view the evidence "'in a light most favorable to the claims of the nonmoving party, with all reasonable inferences drawn in favor of those claims.'"  *Id.* (quoting *Rye*, 477 S.W.3d at 286).

## IV.  DISCUSSION

The Plaintiff in a health care liability action carries the burden of proving:

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

Tenn. Code Ann. § 29-26-115(a).

In this case, the question before us is whether Dr. Maltese's deposition testimony is sufficient to establish a genuine issue of material fact regarding proximate cause. Dr. Lancaster asserts that Dr. Maltese's deposition testimony is insufficient to establish causation. He additionally asserts that his own affidavit negates Plaintiff's claim. Plaintiff, on the other hand, contends:

Dr. Maltese opine[d] that Dr. Lancaster performed within the standard of care during the surgery of October 5, 2015 and during the surgery of October 8, 2015, but he fell below the standard of care during the follow up to both surgeries when he failed to perform either an arteriogram or a CT angiogram despite [Plaintiff's] complaints of pain in her hand. These violations of the standard of care caused [Plaintiff] to lose two full fingers, part of another, and a large portion of the palm of her left hand, as well as a significant decrease in functionality in what remained of her hand.

Plaintiff contends that, although Dr. Maltese could not identify what condition caused the ischemia and eventual necrosis in her hand, "Dr. Lancaster's surgery occluded [Plaintiff's] artery, and that is the legal cause of her injuries."

We begin our discussion of the parties' arguments by noting that it is undisputed that Dr. Lancaster performed surgery to insert an arteriovenous graft on October 5, 2015; that on October 7 it was determined that Plaintiff's radial artery was obstructed or occluded; and that Dr. Lancaster performed a second surgery on October 8 to remove the graft. It also is not disputed that on October 12 a Venous Doppler was performed; that on October 14 a consulting physician documented that he could not palpate Plaintiff's ulnar pulse; and that on October 29 two of Plaintiff's fingers and part of a third were amputated. It also appears undisputed that the October 29 surgery was necessary because necrosis set-in due to ischemia caused by an undetermined condition, and that Plaintiff lost significant use of her left hand. It is not disputed that Dr. Lancaster performed neither an arteriogram nor a CT angiogram.

Dr. Maltese's deposition is the only evidence offered by Plaintiff in support of her allegations of negligence and causation. Plaintiff contends that Dr. Maltese's deposition testimony establishes why her injury occurred. She asserts that Dr. Maltese's testimony establishes that the cause of her pain and the occlusion in her hand would have been found earlier had Dr. Lancaster performed an arteriogram or CT angiogram, that it could

have been corrected, and that the injury resulting in the loss of several fingers and part of her hand likely would not have occurred.

Dr. Lancaster, on the other hand, asserts that Dr. Maltese failed to establish "what medical condition or problem caused Plaintiff's injury." He references Dr. Maltese's testimony that Plaintiff "had some type of ischemia to the left hand, whether it was Steal Syndrome, blockage in an artery, emboli, it could be anything at that point. . . . [T]hat's really the question, what . . . did she really have[,]" in support of his assertion that Dr. Maltese was not able to identify what medical condition caused Plaintiff's injury.

We accordingly turn to whether the trial court erred by awarding summary judgment to Dr. Lancaster upon determining that "the undisputed facts demonstrate that no allegedly negligent act or omission by Defendant Dr. Lancaster caused Plaintiff any injury that would not have otherwise occurred[.]" We note that whether Dr. Lancaster breached the standard of care by failing to conduct an arteriogram or CT angiogram was not adjudicated in the trial court and, therefore, is not before us. Our review is limited to whether a jury reasonably could find that Dr. Lancaster's failure to perform an arteriogram or a CT angiogram to diagnose the cause of Plaintiff's post-surgical pain and symptoms proximately caused her injury.

In his December 2018 deposition, Dr. Maltese testified that the pain Plaintiff was experiencing when she was discharged from the hospital was "not surgical site pain." He stated:

> Surgical site pain, the incision is in the arm in the cubital space or in the upper arm, and she's complaining of hand pain. So those are two different types of pain and two different problems. So they kept saying surgical site pain. That's not what she had. She had severe hand pain from ischemia to the hand. So two different issues. Treatment is different for both of those. Treatment for surgical site pain is pain medicine. Treatment for hand pain is to find out why she's got hand pain and -- which was ischemia and then to correct it as soon as possible.[1]

Dr. Maltese testified that, while the cause of the pain might not have been immediately known, "There's two different things here, surgical site pain, hand pain, and everybody in the whole record is confused over that. Surgical site pain, go home, take pain medicine. Severe hand pain, 10 out of 10, you have to do something." As Dr. Lancaster notes, Dr. Maltese stated that Plaintiff had "some type of ischemia to the left hand, whether it was Steal Syndrome, blockage in an artery, emboli, it could be anything at that point. So . . . that's really the question, what did -- what did she really have." Dr. Maltese stated that he thought Plaintiff had Steal Syndrome, but was not "a hundred percent sure." He stated, "I just have never seen an arteriogram to demonstrate what she

---

[1] It is undisputed that Plaintiff received Dilaudid for pain.

- 6 -

had.  And that's another problem with the record unless she had one that I don't know about.  But I . . . tried to look through the record and I never saw one."

With respect to what happened during the October 8 surgery to cause Plaintiff to lose the ulnar pulse, Dr. Maltese stated, "I don't know. . . . All I know is that there was an ulnar pulse before and there's none at sometime afterwards.  And that's why in this patient it was imperative to image what was going on."  Dr. Maltese went on to state that Dr. Lancaster complied with the standard of care in his performance of the surgeries.  However, he concluded, "[b]ut . . . somehow you had to image that arm to find out why the hand was still dead after he did the procedure [on October 8] because the hand should get better immediately, done.  He took the graft out, should get better."

When asked whether he "would have expected [Plaintiff's] hand function to fully recover a hundred percent," Dr. Maltese replied:

> Not function, I would expect the fingers not to die. . . . I would expect the hand to be warm and the fingers not to die.[2]  When the fingers are dying still after the surgery, you've got to image and find out why immediately because now it's a real emergency. . . .  And that's all I'm saying.  Something happened and the hand didn't get better and . . . no imaging studies were ever done that I could see.  Now, at least I couldn't find any imaging studies that were done.  And that's why I can't say exactly what the real problem is.  You know, she could have aberrant circulation and -- and the ulnar radial came off high up in the arm and then you don't know what you're really tying into.  You may have tied into -- I mean, . . . I don't know what happened, just something happened. It may have been that one of the surgeries before had knocked off one of the arteries.  But -- but actually, that's not really true because we know the ulnar was patent before and now it's not.  At least take that back.  We know there was an ulnar pulse.  Now, that could have been from collaterals.  I mean, you just have no imaging, so you don't know.

Dr. Maltese stated that, although he thought the first surgery on October 5 was "done correctly . . . the problem started with the first surgery[.]"  He stated:

> I'm just saying once you had the problem, once you had a problem now . . . you have to figure out the best options to take care of it.  And -- and the best option would be to try to take care of it before it got to the point that it did, but I think there was something happened at the last surgery that compounded the problem because they lost the ulnar pulse at the last

---

[2] It is unclear from the record whether Plaintiff's hand was warm post-surgery.  In his deposition, Dr. Maltese stated that Plaintiff said her arm was "ice cold" when she was in the ER on October 6.  He also noted that the hospital records indicated that Plaintiff's left hand was warm to the touch.

surgery.

When asked whether he could "say what happened." Dr. Maltese replied:

> And I can't say what happened because we have no anatomical chart to say and that's what confounds me. You have this patient losing her hand and nobody even wanted to know why. That's what I don't understand. I can't figure that out.
>
> . . . .
>
> [A]fter you take the graft out and it doesn't -- and she doesn't get better, then you have to do that. There's not even a question. You have to figure out why am I losing this patient's hand when I took the graft out because you're supposing that the graft is the problem but it wasn't. Something else . . . was the problem because she still lost a part of her hand.

When asked whether he thought Plaintiff's hand was salvageable prior to the second surgery, Dr. Maltese replied:

> [I]f you're still having pain, the hand is alive. So at the time he did the surgery, she was still having pain, the hand is alive.

We note the following exchange:

> Q. So you think, at the time of the surgery, her hand was salvageable?
>
> A. Best I could tell from the chart.
>
> Q. More likely than not?
>
> A. Yes.
>
> Q. And but as I understand your earlier testimony, you can't say, since you don't really know what happened in that surgery, more likely than not, that any imaging would have changed the outcome?
>
> A. I think, more likely than not, you would find the problem and take her back to surgery and do something else.
>
> Q. Post-operatively?
>
> A. Right, because you have to restore the pulse. And from what he said he did in the . . . operation, he said he ran the catheter down the radial artery. So now you have no pulse in the ulnar artery. You have to take her back and run the catheter down the ulnar artery. I mean, you have to try to

restore flow.

Q. Okay. Let me ask you then, hypothetically: If she did have an ulnar pulse after surgery, how would that affect your opinion?

A. So if she had an ulnar pulse and a radial pulse, she shouldn't have lost these fingers. She would have flow to that part of the hand. But . . . hypothetically, she would have her hand if she had a normal radial pulse.

Q. Is there anything else that could have caused her to lose her hand after the October 8th surgery other than the loss of an ulnar pulse?

A. I think the other thing that could have happened is distal immobilization.

Q. And you can't rule that out?

A. You can't rule that out. When I say -- immobilization to the small vessels, so small vessels become occluded and . . . that's a possibility. But, again, you need to image and see if -- if that's it, then you can tell the patient, well, there's nothing further we can do. But until you image, you don't know that.

When asked whether the standard of care required Dr. Lancaster to do additional testing after the October 8 surgery, Dr. Maltese replied, "Either testing or surgery. . . . I can say she should have had testing or surgery or both. . . . And probably both." When asked whether it was possible that an arteriogram performed post-surgery on October 8 would not have shown a problem, Dr. Maltese replied, "It's going to show some problem because she lost her hand, it's got to show something. It just may not have shown something that was correctable." When asked what an arteriogram would have shown, Dr. Maltese replied ". . . I can't say. May have shown something that wasn't correctable and -- or it's not correctable is if she just had the digital arteries in the hand thrombosed, probably not correctable." He continued:

You need to figure out what the problem is and nobody ever imaged her and that's . . . the biggest fault I have in the case is there is no imaging. And . . . why that is, I can't answer that. I mean, I just don't know of anybody that you're going to let lose part of their hand without imaging, any vascular surgeon.

Dr. Lancaster argues that, because Dr. Maltese could not state with certainty what caused the loss of circulation that ultimately resulted in the loss of a significant portion of Plaintiff's hand, Plaintiff failed to present sufficient evidence of causation. He characterized Dr. Maltese's assertion as "circular". He states in his brief, "Dr. Maltese essentially argues that imaging should have been performed because she lost her fingers, and that she lost her fingers because no imaging was performed." Plaintiff, on the other

hand, contends that the root cause of the necrosis in her hand cannot be known precisely because Dr. Lancaster failed to perform the requisite imaging. She asserts that had the imaging been performed, the necrosis resulting in the loss of several fingers and significant use of her hand would have been prevented.

A legal injury "'signifies an act or omission against [a] person's rights that results in some damage.'" *Rye*, 477 S.W.3d at 266 (quoting *Church v. Perales,* 39 S.W.3d 149, 171 (Tenn. Ct. App. 2000)). "'Any want of skillful care or diligence on a physician's part that sets back a patient's recovery, prolongs the patient's illness, increases the plaintiff's suffering, or, in short, makes the patient's condition worse than if due skill, care, and diligence had been used, constitutes injury for the purpose of a [health care liability action].'" *Id.* (quoting *Church,* 39 S.W.3d at 171). Evidence of the failure to conduct appropriate tests to diagnose the underlying cause of a patient's symptoms, assuming such tests are required by the standard of care, can "raise a genuine issue of material fact as to causation." *Stovall v. Clarke*, 113 S.W.3d 715, 724-25 (Tenn. 2003).

It is well-settled that proximate causation generally is a matter to be determined by the trier of fact unless "the undisputed facts and inferences to be drawn from the facts enable reasonable persons to draw only one conclusion.'" *Cotten*, 576 S.W.3d at 638 (quoting *Rains v. Bend of the River*, 124 S.W.3d 580, 596 (Tenn. Ct. App. 2003)). Summary judgment may be appropriate on the issue of causation "'if the evidence is uncontroverted and the facts and inferences to be drawn therefrom make it clear that reasonable persons must agree on the proper outcome or draw only one conclusion.'" *Harvey v. Shelby Cty.*, No. W2018-01747-COA-R3-CV, 2019 WL 3854297, at \*7 (Tenn. Ct. App. Aug. 16, 2019) (quoting *Richardson v. Trenton Special Sch. Dist.*, W2015-01608-COA-R3-CV, 2016 WL 3595563 at \*5 (Tenn. Ct. App. June 27, 2016)). Further, the weight to be given an expert witness's opinions is an issue for the jury and not to be determined by summary judgment. *Stovall*, 113 S.W.3d at 725. On appeal "we must 'make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied.'" *Cotten*, 576 S.W.3d at 637 (quoting *Rye*, 477 S.W.3d at 250).

Our supreme court addressed the element of causation in a medical malpractice action arising from an alleged failure to fully investigate the causes of the plaintiff's symptoms in *Stovall v. Clarke*, 113 S.W.3d 715 (Tenn. 2003). In *Stovall*, the plaintiff's decedent husband ("Mr. Stovall") had a family history of heart disease, was a cigarette smoker, and had high cholesterol. *Stovall*, 113 S.W.3d at 717. An EKG performed by defendant physician Lois E. Clarke ("Dr. Clarke") in 1992 revealed a possible inferior wall myocardial infarction. In January and February 1997, Mr. Stovall saw Dr. Clarke and complained of shortness of breath, a chest cold, a persistent cough, and wheezing. After Mr. Stovall's third visit, Dr. Clarke referred him to defendant Robert W. McCain ("Dr. McCain"), a pulmonologist. *Id.* at 718. Dr. McCain examined Mr. Stovall, who continued to complain of shortness of breath and a persistent cough, on February 28.

"Dr. McCain concluded that Stovall had been in good health, found that his cardiac and lung evaluations were normal, and determined that he had never complained of chest pain. Dr. McCain diagnosed Stovall with bronchitis aggravated by smoking, for which he was being treated with antibiotics, and he did not order additional tests." *Id.*

Mr. Stovall died in March 1997 "from what was later determined to be coronary artery disease." *Id.* Mr. Stovall's wife ("Ms. Stovall") filed malpractice actions against Dr. Clarke and Dr. McCain, "alleging that both physicians negligently failed to perform appropriate diagnostic tests and failed to discover the coronary heart disease that caused Gerald Stovall's death." *Id.* Defendants moved for summary judgment, denying allegations of negligence, asserting lack of causation, and arguing that Ms. Stovall's expert did not recognize the standard of care in the community (the "locality rule"). *Id.* Ms. Stovall offered additional expert depositions purporting to comply with the locality rule. *Id.* Ms. Stovall's expert asserted that Dr. Clarke failed to appropriately investigate signs and symptoms suggestive of heart failure or, alternatively, to refer Mr. Stovall to a cardiologist for evaluation. *Id.* at 720. With respect to Dr. McCain, Ms. Stovall's expert "stated that Dr. McCain failed to take a detailed and meaningful medical history, failed to investigate other causes for the decedent's shortness of breath and cough, and failed to consider coronary artery disease as a potential cause of Stovall's symptoms." *Id.*

After considering all the evidence, the trial court awarded summary judgment to both defendants without making specific findings. *Id.* On appeal, this Court reversed summary judgment in favor of Dr. Clarke, but affirmed summary judgment in favor of Dr. McCain on the basis that there was no genuine issue of material fact regarding causation. *Id.* at 720-21. "In sum, the court [of appeals] held that the plaintiff did not show that any act or failure to act by Dr. McCain caused the decedent 'to suffer injuries that would not otherwise have occurred.'" *Id.* at 721.

The supreme court disagreed that Ms. Stovall's experts had "failed to raise a genuine issue of material fact as to causation based on the acts or omissions of Dr. McCain." *Id.* at 724-25. In reaching its conclusion, the *Stovall* court referenced Ms. Stovall's expert's statement that Dr. McCain had failed to investigate "other causes for Stovall's symptoms, including coronary artery disease[.]" *Id.* at 724. It also noted the expert's statement that, had Dr. McCain properly investigated Mr. Stovall's condition, *the underlying heart condition would have been diagnosed and treated*, and Mr. Stovall most likely would have survived. *Id.* The *Stovall* court noted expert testimony that if Dr. McCain

> "had complied with the standard of care required of him in February of 1997 during his pulmonary consultation, Mr. Stovall's underlying heart condition would have been diagnosed, and he would probably have undergone successful medical and or surgical management of his heart

- 11 -

problem," and that "to a reasonable degree of medical certainty, he would be alive today."

*Id.* The *Stovall* court affirmed this Court's judgment with respect to Dr. Clarke, but reversed summary judgment in favor of Dr. McCain. *Id.* at 725.

In the current case, viewing Dr. Maltese's testimony in a light most favorable to Plaintiff, and drawing all reasonable inferences in her favor, we find that a finder of fact reasonably could determine that an arteriogram or a CT angiogram would have revealed the underlying cause of the ischemia resulting in the necrosis in Plaintiff's hand. However, we note that the second surgery was performed on October 8, and Plaintiff's ulnar pulse was not determined to have been lost until October 14. There is nothing in Dr. Maltese's testimony to indicate at what point between October 5 and October 29 imaging would have revealed a condition that could have been corrected. More significantly, Dr. Maltese did not establish that such imaging would have revealed a reversible condition. Dr. Maltese stated that imaging "[m]ay have shown something that wasn't correctable . . . or it's not correctable."

Although the plaintiff need not demonstrate the full extent of her injuries to survive a motion for summary judgment in a medical malpractice action, "a verdict cannot be based on mere speculation, conjecture, and guesswork[.]" *Church*, 39 S.W.3d at 171 (citation omitted). "[A] plaintiff in a medical malpractice case in Tennessee must 'prove that it is more likely than not that the defendant's negligence caused plaintiff to suffer injuries which would have not otherwise occurred.'" *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993) (quoting *Boburka v. Adcock,* 979 F.2d 424, 429 (6th Cir. 1992)). "Causation in fact is a matter of probability, not possibility, and in a medical malpractice case, such must be shown to a reasonable degree of medical certainty." *Id.* (citation omitted). Evidence demonstrating "a mere possibility of such causation is not enough" to withstand a properly supported motion for summary judgment. *Id.* (quoting *Lindsey v. Miami Dev. Corp.,* 689 S.W.2d 856, 861-62 (Tenn. 1985)).

Unlike the expert testimony reviewed by the court in *Stovall*, Dr. Maltese's testimony is ambiguous and inconclusive with respect to whether additional testing would have revealed a condition that could have been treated, thereby preventing the injury. Dr. Maltese testified that an arteriogram or CT angiogram may or may not have revealed a reversible condition. He did not testify that the failure of Dr. Lancaster to perform an arteriogram or CT angiogram resulted in a condition or injury that could have been corrected or that would not have otherwise occurred. Dr. Maltese stated that the imaging would have "show[n] some problem . . . it's got to show something[,]" but "[i]t just may not have shown something that was correctable." We accordingly agree with the trial court that Plaintiff failed to produce evidence to establish, with the requisite degree of medical certainty, that an allegedly negligent act or omission by Dr. Lancaster caused an injury that would not otherwise have occurred.

## V. CONCLUSION

In light of the foregoing, the judgment of the trial court awarding summary judgment to Dr. Lancaster is affirmed. Costs of this appeal are taxed to the Appellant, Linda Bridges, and her surety, for which execution may issue if necessary.

_____

CARMA DENNIS MCGEE, JUDGE